[No. 20106. Department One.—November 19, 1885.]

THE PEOPLE, RESPONDENT, v. LEW ROBERTSON, APPELLANT.

CRIMINAL LAW—MURDER—EVIDENCE.—The evidence examined, and *held* sufficient to sustain a verdict of murder in the second degree.

ID.—SELF-DEFENSE.—Where the killing occurred during an assault upon the defendant brought about by his own misconduct, he must, in order to justify the killing as an act of self-defense, have really and in good faith endeavored to decline any further struggle before the act was committed, provided he could do so with safety.

ID.—INSTRUCTIONS.—The rulings upon certain instructions approved.

ID.—WITNESSES—WHO TO BE PRODUCED BY PROSECUTION.—The court below denied a motion made by the defendant after the prosecution had rested, for an order requiring the prosecution to call and examine as witnesses certain persons who were shown by the testimony of one of the witnesses for the prosecution to have been present at the time of the homicide. *Held*, no error.

APPEAL from a judgment of the Superior Court of the county of Mendocino, and from an order refusing a new trial.

The facts are stated in the head-notes and the opinion of the court.

*J. A. Cooper, J. Q. White,* and *J. M. Mannon,* for Appellant.

The verdict is not supported by the evidence. (Pen. Code, § 187; *People* v. *Clark,* 7 N. Y. 392; *Darry* v. *The People,* 10 N. Y. 120.) It was error in the court not to compel the prosecution to call those persons who were present at the homicide. (*Territory* v. *Hanna,* 5 Mont 284; *Hurd* v. *The People,* 25 Mich. 415; *Maher* v. *The People,* 10 Mich. 226; Roscoe's Criminal Evidence, p. 135; *Weller* v. *The People,* 30 Mich. 23; Wharton's Criminal Evidence, § 448.)

*Attorney-General Marshall,* for Respondent.

McKEE, J.—Defendant was convicted of murder in the second degree and sentenced to ten years in the State prison. On this appeal from the judgment and an order denying a motion for a new trial, it is contended:—

1. That the verdict is not supported by the evidence.

The evidence shows that defendant, on the 24th of August, 1884, twice stabbed one A. Davis with a butcher knife. In one of the stabs the knife was driven into his body, between the fifth

and sixth ribs, upwards and forward toward the heart, the point
of the knife penetrating the heart, causing almost immediate
death. The stabbing was done in the excitement of an angry
quarrel and scuffle, which originated in an attempt by the
defendant and two others to buy a watermelon at a store in the
town of Covelo, kept by the wife of Davis. Davis himself was
in charge of the store at the time, and when the parties asked
him to sell them a watermelon on credit, he told them he had
no watermelons to sell on credit, and to go along about their
business. They did not leave. Defendant refused to go, saying
he would do as he pleased, and commenced to abuse Davis with
opprobrious and threatening language. In these circumstances,
Davis picked up an iron-hooked stick, six or seven feet long,
which was used in the store for bringing down buckets and
things from hooks on which they hung, and with the end of the
stick he "poked and punched" the defendant, who fell on the
porch of the store. The defendant got up, and instead of going
away turned upon Davis, who was standing inside the store, and
Davis again used the stick to "punch" him, but the defendant
got hold of the stick, and Davis, in trying to jerk it away from
him, jerked him inside the store, where, in the struggle over the
stick, defendant continued to curse and swear at Davis, and
threatened to kill him. In these circumstances the wife of
Davis stepped in between the two, and ordered her husband to
go to the back part of the store, and the defendant to go away.
But neither let go the stick, and the defendant struck at Davis,
past the woman, cutting one of her fingers in the act. The blow
caused Davis to stagger and cry out that he was cut. In the
act of staggering he let go the stick and picked up an ax-handle,
which he raised as in the act to strike, when the defendant closed
with him, stabbed him again and shoved him against a show-
case on the counter of the store, where he fell and died with the
defendant atop of him. Defendant immediately arose from the
body, walked out of the store and across the street to a saloon
where, as a witness expresses it, "he laid right upon a card-
table in the saloon, turned one leg upon it and pulled out his
knife, on the blade of which there was blood all the way up to
the hilt, and said, 'I have been spaying, or slaying, the s——
of a b——.'"

In his own behalf the defendant testified: "Deceased got mad about something I said about the melon, and jumped down and got this rod and called me a d—— s—— of a b——, and punched at me with one end of the rod. He then turned the rod and punched at me with the other end and knocked me down. While I was getting up he got an 'ax-handle and hit me; the second time he hit me I caught the handle and he jerked me inside the store; he jerked away from me in the store and started to hit me again with it. I ran in under him then and cut him. As soon as I could get him to let loose of me I walked right out and went over to Mr. Montague's. He hit me in the stomach with the stick and knocked me down on my back."

This evidence, it is argued, proves that the killing was done in the heat of blood, upon provocation, and without malice, and that it amounted to manslaughter only, and not murder.

But the conduct of the defendant in connection with the homicide, his persistent threats to kill Davis, the use of a deadly weapon in killing him, and his bravado immediately after the killing, are things which do imply malice in them. Their sufficiency as evidence to prove the existence of malice was matter for the consideration of the jury; and as the jury found from them that the defendant unlawfully killed the deceased in malice, and not in the heat of passion caused by the assault made upon him by the deceased, it cannot be said, as matter of law, that the evidence was insufficient to support their verdict.

The mere fact that the deceased and defendant were in actual combat at the time of the homicide does not of itself mitigate the homicide or justify or excuse it. Justification or excuse for taking human life must arise out of the circumstances in which the killing took place, as proved by the testimony on the part of the prosecution or of the defendant. And it is well settled, if the circumstances show that a person, armed with a deadly weapon, on being assaulted, takes advantage of the assault made upon him to kill his assailant, and does, in execution of his purpose, kill him, not in the heat of passion caused by the assault, nor in reasonable defense of himself against the assault, it is murder. (2 Bish. Crim. Law, 736.)

It is also well settled that if the circumstances of a combat following an assault show that from the outset the words and

acts of the defendant indicated an intention to kill, or to take his assailant at an unfair advantage to kill him under the color of the assault, it is murder. (1 Russell on Crimes, pp. 527, 532, 585, 592; 2 Wharton on Criminal Law, §§ 953, 955, 987, 996.)

2. The next assignment of error is that the court instructed the jury as follows:—

"Before the defendant can claim that he was acting in self-defense it must appear that the defendant must really and in good faith have endeavored to decline any further struggle before the homicide was committed. And in this case, if you believe from the evidence that the defendant was engaged in mortal combat with Davis, the deceased, and that the defendant did not really and in good faith endeavor to decline any further struggle before the homicide was committed, if one were committed, then, and in such case, the defendant cannot avail himself of the plea of self-defense."

The proposition is, that if a person is assaulted by another, with whom he engages in a combat, he must really and in good faith endeavor to decline any further struggle before taking the life of his assailant.

According to the common law it is the duty of a person assaulted to give way "as far as the fierceness of the assault will permit him." (1 Hale, P. C. 483.) But if the assault be so fierce as not to allow him to yield a step without manifest danger of his life or great bodily harm, then, in his defense, he may kill his assailant instantly; and this, says Blackstone, "is the doctrine of universal justice as well as of the municipal law." (4 Blackst. Com. p. 185.)

Upon that principle are founded the provisions of our Penal Code on the same subject. Section 197 of the Code in effect declares: That if a person is assaulted in such a way as to give him ground as a reasonably prudent man in the condition in which the assault places him to apprehend a design on the part of the assailant to commit a felony upon him, or to do him some great bodily harm, he has the right instantly to defend himself, and, if necessary to prevent such real or apparent danger to his person, to kill his assailant. Real or apparent danger, or danger imminent and immediate to life or limb, is therefore a sufficient condition in which to exercise the right of self-defense.

No withdrawal or retreat is required. So assailed a person has a right to stand his ground, and, if necessary in defense of himself, slay his assailant. But necessity, real or apparent, for taking human life, arising out of the circumstances in which the homicide is committed, must exist, and the person himself must be without fault.

"The weight of authority," says the Supreme Court of Indiana, "establishes the doctrine that when a person, being without fault and in a place where he has a right to be, is violently assaulted, he may, without retreating, repel force by force, and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable." (*Runyon* v. *The State*, 57 Ind. 84; 1 Bish. Crim. Law, § 865.)

In this case, according to the evidence, the defendant was not conducting himself lawfully. He should have left the store when he was told to go. He had no right to remain and abuse the person in charge of the same with opprobrious epithets and threats to kill. Being where he had no right to be and doing what he had no right to do, he was not without fault when Davis assailed him in order to compel him to go away. Nor did the nature of the assault upon him endanger his life or limb. There was no time, from the commencement of the affray to the time of the stabbing, when he could not have withdrawn without danger. That being so, the necessity for taking the life of his assailant did not exist, except by his own creation; for when he got up from the porch where he had fallen, he could have gone away out of danger; but he turned upon Davis, and engaging him in a struggle over the stick with which Davis had been prodding him, forced him inside the store and killed him. When a killing takes place under such circumstances, it is true, as matter of law, that the slayer should, really and in good faith, have endeavored to decline any further struggle before the homicide was committed. (Pen. Code, sub. 3, § 197.)

3. The giving of the following instruction to the jury is also assigned as error:—

"If the jury believe from the evidence that there was first an affray on the porch of the store, and that the deceased pushed the defendant down with the iron hook, and that then the deceased returned to the store, and the affray then ceased for a

sufficient length of time for reason to have resumed its sway, and the defendant had sufficient time to realize the situation before anything further was done by the contending parties, and that then the defendant went into the store and there attacked the deceased, and then killed him as charged in the information, and not in necessary self-defense, then I charge you that the defendant was not justifiable in inflicting the mortal blow."

It is said there was no evidence of a cessation of hostilities. But it does appear that when the defendant fell on the porch Davis did not continue the assault upon him; there was therefore a pause in the combat, and to that phase of the case the instruction was applicable.

4. The refusal to give the ninth instruction, in a series of instructions which the defendant asked, did not prejudice the defendant, because the matter to which it related was substantially covered by the eighth instruction which the court had given to the jury at the defendant's request.

5. There was no error in the denial of a motion made by the defendant after the prosecution rested, to order the prosecution to call and examine as witnesses in the case certain persons who were said to have been present at the time of the homicide.

Besides, the same persons were afterwards called and examined as witnesses by the defendant.

We find no prejudicial error in the record.

Judgment and order affirmed.

Ross, J., and McKINSTRY, J., concurred.