[Crim. No. 934.  Second Appellate District, Division One.—January 19, 1923.]

## THE PEOPLE, Respondent, v. TOM ESTRADA, Appellant.

[1] CRIMINAL LAW — MANSLAUGHTER—SELF-DEFENSE—EVIDENCE—VERDICT.—In this prosecution for murder, in which the defendant was found guilty of manslaughter, the written statement made by the defendant shortly after his arrest, which was the only direct evidence showing that the deceased was killed by defendant, did not warrant the conclusion that defendant, in repelling the attack of the deceased, acted other than in necessary self-defense; and there were no other facts shown which would furnish ground for the finding of guilt by the jury.

[2] ID.—SELF-DEFENSE—DUTY TO RETREAT.—The law does not impose the duty of retreat upon one who without fault himself is exposed to a sudden felonious attack, but the duty of withdrawal or retreat is imposed upon him alone who is the first aggressor, or has joined in a mutual combat. A person has a right to stand his ground and meet by force a sudden and violent attack; and while killing must be under an absolute necessity, actual or apparent, as a matter of law that necessity is deemed to exist when an innocent person is placed in such sudden jeopardy.

[3] ID. — STATE OF MIND OF PERSON ATTACKED — CHARACTER OF ASSAULT — EVIDENCE. — In such prosecution for murder, it was not necessary that the defendant have in words pictured his state of mind as it was at the time of the attack, where under his statement of the encounter the circumstances were such as to indicate nothing else but that by doing what he did he was defending himself against a murderous assault then being made by the deceased; and the defendant's swollen and bruised body and the production of the club used by the deceased furnished sufficient evidence of the character of the assault by the deceased, if defendant's own statement was not conclusive on that proposition.

[4] ID.—FLIGHT—CONSCIOUSNESS OF GUILT—EVIDENCE.—There having been no contention by the prosecution that defendant's act in leaving his customary abode on the morning after the tragedy and going to an old adobe house on a neighboring ranch several miles away was a circumstance tending to show flight and hence indicating a consciousness of guilt, the trial court did not commit error in excluding evidence offered by defendant to show that at the

---

2. Duty to retreat under attack when not on one's own premises, note, 18 A. L. R. 1279.

time defendant left his customary abode on the morning after the tragedy and went to the adobe house he left word as to where he might be found if wanted.

APPEAL from a judgment of the Superior Court of Los Angeles County. Sidney N. Reeve, Judge. Reversed.

The facts are stated in the opinion of the court.

R. C. Noleman for Appellant.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

JAMES, J.—Defendant was charged with the crime of murder and a verdict was returned finding him guilty of the crime of manslaughter. He appeals from the judgment and from an order denying his motion for a new trial.

[1] It is first claimed that the evidence was insufficient to justify the verdict. The killing of Eduardo Murillo by appellant on the third day of July, 1921, in Clearwater, in the county of Los Angeles, was admitted, but appellant contends that upon all of the evidence but one conclusion can be drawn and that is that the act was done in necessary self-defense. Necessarily, as this court in its consideration of questions presented is limited to errors of law alone, if the evidence presents a conflict, the facts must be resolved against the defendant. The only direct evidence showing that the deceased was killed by the defendant consisted of a written statement made by the defendant shortly after his arrest. On the morning of the 4th of July, 1921, the dead body of Murillo was found on the public roadside. There was a wound in his back on the left side, which the autopsy surgeon determined had been made by a knife which had penetrated the abdominal aorta. Close beside the dead man lay a club of eucalyptus wood, about two and a half to three inches in diameter and about three feet long. There were no wounds or bruises noticeable upon the body of Murillo except that which has already been referred to. Around the body and for a distance, in one direction at least, of approximately twelve feet, the grass which grew there had been trampled or beaten down and there was blood in several places within the trampled area. The knife with

which the fatal wound was inflicted was not found. Relations between the deceased and defendant had been friendly. The deceased boarded at the house of the mother of defendant, where the latter also lived. During the afternoon of the 3d of July the two men had been together and called upon several of their friends in the neighborhood and had had several drinks of intoxicating liquor. There was evidence showing that the deceased had been drinking during the month preceding the day of the tragedy, although as to the quantity and kind of liquor drunk by him the evidence does not show, nor does it show how often he drank. At about 10 o'clock of the night of the 3d of July the man at whose house deceased and defendant last called walked some distance down the road with them, when he left the two men together. This man testified that deceased was quarrelsome and that deceased said to defendant, "I am going to do you up, you and your mother, too." As to what occurred between the two men from that point on to the time when the fatal blow was struck no witness was produced to tell, and the jury had only the statement of the defendant to advise them of the details of the encounter. That statement will shortly appear. On the following morning defendant requested a friend to drive him several miles away to an old adobe house on a neighboring ranch, at which place he was arrested shortly after the discovery was made of the dead body of Murillo. When the arresting officer informed him what the charge was he replied: "I don't know anything about it." He was immediately taken to the county jail. Before being incarcerated therein it was noticed that when he was touched on his left side he winced, although he had up to that time made no complaint of any injuries. Upon the officer inquiring of him what was the matter, he said that he had been injured, and after his shirt had been taken off a very large bruise was discovered on his left breast and across his left shoulder. The bruise on the chest was described as being about as "big as a man's fist." The officers thereupon inquired of him as to whether he was willing to make a statement and he said that he was so willing and proceeded to tell what had happened between him and Murillo after they had been left on the road by the friend. The prosecution introduced this statement as a part of its testimony at the trial and the defendant did

not testify. The matter of the sufficiency of the evidence suggests two questions: First, upon the facts as shown by the statement made by the defendant at the jail after his arrest, was the defendant shown to have been justified in the killing of Murillo as an act of self-defense? Second, if the conclusion on that proposition is in the affirmative, were any other facts shown (and we have given the gist of all of them) which would furnish ground for the finding of guilt by the jury? We here quote the statement as made by the defendant in the presence of the arresting officers at the county jail in full as · it is shown in the transcript, except that a word of vulgar import is omitted as indicated by the parentheses. The term employed is sufficiently apparent from the context without being literally reproduced. "Q. What is your name? A. Tomas Estrada. Q. Where were you born? A. In the United States. Q. What town? A. Los Angeles. Q. Are you willing to make a statement, free and voluntary, without duress, or threats of any kind? A. Yes. Q. Where were you on Sunday night, July 3d? A. In Clearwater, I was with Ed Murillo and Samon Maccias. Q. Where did you meet them? A. I met them at 4 o'clock in the afternoon and we went to Samon's house, and from Celestin's house went to Acevedo's house. We stayed there at Acevedo's house two or three hours. Q. Did you have anything to drink? A. Yes, but Acevedo had some—he gave us a few drinks. Q. After you had your drinks what did you do? A. He gave us a half a gallon of potato wine. Q. It has a good kick? A. I think it has. Q. What did you do then, what happened? A. Then we started for the house. Q. Whose house? A. I was going to my house and Samon was going to his house. Q. Where was the deceased? A. He was with us, that is, Samon, the deceased and us, Ed started to abuse me and wanted to fight. Q. What did he say? A. He told me to go and (——) my mother and it was not the first that he owed. Q. What did you understand when he told you to go and (——) your mother, and it was not the first he owed, what did you understand? A. I understood it, that being he had killed my half-brother, he could kill me. Q. Is that what you understood? A. Yes, sir. Q. When did he kill your half brother and where? A. He killed him between San Pedro and Wilmington. Q. How long ago? A. About four

or five years ago I think, then right after that he struck me a blow. Q. Where did he hit you? A. On the jaw, and then we clinched and I broke away, and he went over and got a club, and when he was coming back he had a knife in his hand. Q. In what hand? A. I could not tell you what hand it was in. Q. How do you know he had a knife? A. I saw it. Q. You don't know in what hand he had it? A. I think he had it in his left hand, because he had the club in his right hand. Q. What did he do? A. He struck at me with the club, and he hit me with the club on the left hand, and the second blow [indicating] he hit me on the left breast, and then he struck me another blow on the right arm, a glancing blow, I saw the knife drop, and then I grabbed the knife, as he swung to strike me, he swung around and as he did I shoved the knife in him, and stuck him on the side [indicating]. Q. And what did you do? A. And then I left. Q. What did you do with the knife? A. I dropped the knife. Q. Where? A. Close to the body of the deceased. Q. And what next? Where did you go? A. I went to my house, to my mother's house. I did not want to tell my mother what had happened, and I went over to the adobe, and then I stayed there until the officers came for me. Q. Had you had any trouble with this man before? A. No not any trouble, but he always tried to belittle me, he always had it in for me. Q. How do you know he had it in for you? A. I don't know why he had it in for me. I never done him anything. I never done him any harm. I done him good. For a fact he owe me six dollars that I loaned him. He had not been working for some time. Q. Did you have a coat on when you went over to Acevedo's house. A. He had a thin coat on, and he said he was cold, and I loaned him my coat. Q. Where were you when you loaned him your coat? A. I was leaving Acevedo's house. Q. Was this your book and coat found near the body of the deceased? A. Yes."

In our opinion there is nothing indicated by the narrative as expressed in the statement of the defendant to warrant the conclusion that defendant, in repelling the attack of Murillo, acted other than in necessary self-defense. The deceased was quarrelsome and threatening and, while the facts of that occurrence are not made to appear, it does appear that the defendant knew that at a prior time the de-

ceased had killed a half-brother of defendant. A further fact appeared in evidence, which may be added to the preceding statement, and that is that deceased was a young and vigorous man of about twenty-seven years of age, heavier and more muscular than the defendant, who was at the time about thirty-five years old. [2] As the defendant pictured the encounter, no particular interval of time elapsed between the acts of assault committed by deceased until the fatal blow was struck. There was no duty resting upon the defendant to retreat under the circumstances. "Our law nowhere imposes the duty of retreat upon one who without fault himself is exposed to a sudden felonious attack, and that the duty of withdrawal or retreat is imposed upon him alone who is the first aggressor, or has joined in a mutual combat, . . . This state has upheld a defendant's right to stand his ground and meet by force a sudden and violent attack. So that while the killing must be under an absolute necessity, actual or apparent, *as a matter of law* that necessity is deemed to exist when an innocent person is placed in such sudden jeopardy." (*People* v. *Lewis*, 117 Cal. 191 [59 Am. St. Rep. 167, 48 Pac. 1089], citing *People* v. *Hecker*, 109 Cal. 451 [30 L. R. A. 403, 42 Pac. 307].) [3] It was not necessary that the defendant should have in words pictured his state of mind as it was at the time of the attack, for under his statement of the encounter the circumstances were such as to indicate nothing else but that by doing what he did he was defending himself against a murderous assault then being made by the deceased. That the attack made by Murillo was of that character, the defendant's swollen and bruised body and the production of the club used by the deceased furnished sufficient evidence, if defendant's own statement was not conclusive on that proposition. The case for the prosecution is not aided at all by reference to the provisions of section 1105 of the Penal Code; rather the contrary. That section provides as follows: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, *unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.*" The proof on the part of the prosecution (referring now to the statement of the defendant) did, as we have

indicated, show a case of justification, and there is nothing in any of the other evidence presented which in anywise tends to contradict or dispute defendant's version of the affair. The fact that upon the ground there were signs of a struggle, indicated by the trampling down of grass, and that spots of blood were distributed in several places away from the body, is wholly consistent with the story told by defendant. The latter was not asked to describe precisely what movements were made and what ground was covered by the two men engaged in the encounter. The distribution of blood at the several places may have been occasioned by the movements of the deceased after he had been cut by the knife and before he fell to the ground. The surgeon who made the post-mortem examination testified that a man wounded as deceased was might die very quickly or not for some time thereafter—even several hours. We conclude that defendant's first contention is well made and that the verdict of the jury is not supported by the evidence.

Other errors are urged which refer to instructions as given and refused, and to the ruling of the trial judge in excluding offered evidence showing that at the time defendant left his customary abode on the morning after the tragedy and went to the adobe house he left word as to where he might be found if he was wanted. The instructions of the court taken as a whole must be said to correctly state the law. While conceding this, it may be added that in their tenor the instructions of the court were critical of the self-defense claim. The court might well have given more comprehensive instructions on the right of self-defense as viewed from the standpoint of the accused. [4] As to the rejected evidence, error does not appear, because no contention appears to have been made by the prosecution that defendant's act in going away and to the adobe house on the morning after the tragedy was a circumstance tending to show flight and hence indicating a consciousness of guilt. No instruction was given the jury to advise them that evidence of this act of the defendant should be considered as showing an attempt to escape arrest. If the prosecution had relied upon the fact as showing flight and the court had predicated an instruction upon it, it would seem clear that the rejected testimony should have been admitted. Flight involves concealment and, if there was no concealment, evidence of the departure

of an accused person from his customary place of abode could hardly be considered as a guilty circumstance.

We have adverted to the latter contentions of appellant because of their being the subject of serious argument in the briefs. Our conclusion on the first point considered necessarily and by itself disposes of this appeal.

The judgment and order are reversed.

Conrey, P. J., and Houser, J., concurred.