[Crim. No. 3727. Second Dist., Div. Three. Mar. 2, 1944.]

THE PEOPLE, Respondent, v. INEZ HATCHETT, Appellant.

Crispus A. Wright for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

SHINN, J.—Defendant was convicted of manslaughter committed in the shooting of one Ernest Dempsey. She had originally been charged with murder, had been convicted of manslaughter, and the conviction had been reversed because of the failure of the court to instruct the jury in the law of self-defense. (*People* v. *Hatchett* (1942), 56 Cal.App.2d 20 [132 P.2d 51].) The information had been amended to charge manslaughter. Upon appeal from the judgment and order denying her motion for new trial defendant contends that the evidence was insufficient to support the verdict and she specifies error in the giving and refusal of instructions. It is necessary that the evidence be stated somewhat fully, not so much for the purpose of demonstrating its sufficiency to justify the verdict as for the purpose of showing that the state of the evidence was such that the failure of the court to instruct the jury fully and fairly operated to the substantial prejudice of defendant's case and resulted in a miscarriage of justice.

Defendant is a Negro woman 33 years of age, married but separated from her husband. She lived alone in a small house and was employed. For several years prior to December, 1941, she and Dempsey, also a Negro, 27 years of age and unmarried, had maintained an illicit relationship. Dempsey then married but did not entirely break off his relations with defendant; he continued to force his attentions upon her. On the day of the shooting, March 31, 1942, defendant was standing on a street corner talking with an acquaintance, a Mr. Welcher, whom she had met there by chance. Dempsey passed by in his car, stopped, parked the car, got out and started across the street toward defendant, who advanced to meet him. What occurred from that time on was narrated by defendant and corroborated in part by others who were in her company until a short time prior to the shooting. Defendant testified that Dempsey had an open knife in his hand as she met him, appeared to have been

drinking and was very angry with her because she had been talking with Mr. Welcher; he insisted that she get into the car with him, which she did, and they drove to her home. Arriving there, defendant ran up the steps, followed by Dempsey with the open knife in his hand. Inside the house Dempsey started quarreling with defendant. A telephone call came for defendant from a Mrs. Walters, inviting defendant to take dinner with her and two men. Defendant accepted and when a Mr. Jeeters called for her she went into the bathroom to dress. Dempsey followed her, protesting her going out with Jeeters, slapped her and again exhibited the knife, which defendant took away from him when he took it out of his pocket. He appeared at that time to be intoxicated. Defendant accompanied Mr. Jeeters to the Rossmore Grill, where they met Mrs. Walters and a man named Eddie. During the dinner Dempsey appeared at the grill, parked his car across the street and waited for defendant. The four diners, when they left the cafe, entered a car and went to defendant's home; Dempsey followed them and parked his car near defendant's house. Defendant and her three guests had a drink; Dempsey entered the house and defendant's guests left, Mrs. Walters and Eddie by the rear door and Jeeters by the front door to meet the others in front of the house. Defendant asked Dempsey why he did not leave her alone and threatened to call the police and have him arrested; she took up the telephone and Dempsey picked up a flower vase from a table and threatened her with it, and she did not make the call. Defendant testified that she then called Dempsey's wife, told her that he was in her house drunk and threatening to kill her, and asked her to come and get him; that Mrs. Dempsey asked defendant to have her husband come to the phone, which he refused to do. A scuffle took place between defendant and Dempsey and defendant went into the kitchen. According to her testimony, the later events immediately prior to the shooting were the following: When defendant started toward the kitchen Dempsey threatened to kill her and himself because defendant didn't want him any more. In the kitchen defendant washed the glasses that had been used in serving the drinks and came back to get a clean towel from her front bedroom. As she started to leave the bedroom she saw Dempsey standing in the living room with defendant's revolver in his hand; he knew, she testified, where she kept the gun; she stood in the bedroom

doorway; Dempsey had a strange look in his eyes, he pointed the gun at defendant and said he was going to shoot her. Defendant ducked and ran into Dempsey, the gun went off and fell to the floor in the direction of the dining room; a tussle took place, defendant picked the gun up from the floor, started toward the rear of the house, remembered that the rear door was locked, turned around, saw Dempsey coming toward her five or six feet away with a metal smoking stand weighing two or three pounds upraised in his hand. Defendant then fired four shots; she did not remember how many shots she fired. Dempsey staggered back and fell against the front door. Defendant ran to him and dropped the gun and it was found by the officers under Dempsey's body. Defendant got Dempsey a drink of water which he asked for and called the police. She was hysterical when the officers arrived and they had difficulty in quieting her; she first told them that Dempsey had shot himself, and upon further questioning testified that she had shot him in self-defense. Defendant testified to several occasions upon which she had been attacked by Dempsey when he was intoxicated. Upon one occasion he came to the home of a Mrs. Glasgow, a friend of defendant, and dragged defendant off the porch; they were separated by Mrs. Glasgow and Dempsey at that time threatened to kill defendant because she did not want him any more. Upon another occasion Dempsey attacked her in his car. He stepped from behind a telephone pole, twisted defendant's arm and forced her into his car where he inflicted further injuries; he was drunk at the time. On another occasion, at the home of a Miss James, Dempsey pulled defendant off the porch and choked her; they were separated by Miss James, who testified that before the attack, when Dempsey was inquiring for defendant, he said he would break her neck when he found her; that he had found out that she was with another man. This occurrence was but a few days before the shooting. Miss James testified that about a month before the shooting she had witnessed another incident which had been testified to by defendant and that on that occasion she found Dempsey in his car with defendant, apparently choking her, and that he told Miss James at that time that he would get Inez (defendant) if it was the last thing he ever did. Miss James took defendant into her car at that time and drove around the block. Defendant testified that upon another occasion after his marriage Dempsey met

defendant on the street and persuaded her to get into his car upon the pretense that his uncle wanted to see her. They arrived at the uncle's house and defendant found that Dempsey's representation to her was false. When defendant left the uncle's house Dempsey followed her, knocked her to the ground and beat her, leaving scars upon her hands, some of which she testified were still there at the time of the trial. A Mrs. Leas testified that Dempsey had made threats that he would kill her and also defendant. Numerous witnesses, including one of the officers who arrested defendant, testified that Dempsey's reputation for peace and quiet was bad. Others testified to the good reputation of defendant, but no witness testified that Dempsey had a good reputation or defendant a bad one.

Turning to the evidence of the People, we find the testimony of the wife of deceased that defendant telephoned to her on the evening of the shooting and told her that Dempsey was at her home, cursed her, accused her of going out with other men; that she laid down the phone and refused to listen to defendant and finally hung it up; that she then called the police because she wanted them "to go there and get the both of them" but she could not tell the officers the address. (Upon cross-examination she stated that she knew that the Hatchett house was the only one on Wadsworth between Fifty-second and Fifty-third Streets and that she had been there.) That she called defendant about five minutes after defendant had called her; that defendant answered the phone and said, "He isn't coming back to you again. I will kill him before he does." She testified that she heard three shots, heard her husband groan and two more shots and heard defendant hang up her receiver. She testified further on cross-examination as follows: "Q. Incidentally, Mrs. Hatchett had called and asked you to come and get your husband? A. Yes. Q. She called you to let you know that your husband was there, and for you to come and get him? A. Yes." It is unnecessary to point out the improbabilities in Mrs. Dempsey's account of the shooting. If it had occurred as she testified, defendant's conduct would have shown a premeditated purpose to kill Dempsey and she would have been guilty of murder. It must be presumed that the jury in the first case returned a verdict in accordance with the facts found and that in finding defendant guilty of manslaughter when she was charged with murder they determined

that Mrs. Dempsey had falsified when she testified that defendant, after telephoning her to come and get her husband, five minutes later shot him because she did not want him to leave. In other words, the first verdict was in effect a declaration on the part of the jury that they rejected Mrs. Dempsey's testimony that the defendant advised her over the telephone that she was going to kill her husband, and that immediately thereafter she heard a series of shots and her husband groaning. This is a fact which should be borne in mind in considering the theories of the shooting which were tenable under the evidence upon the second trial.

We have discussed Mrs. Dempsey's testimony and quoted from it because a careful appraisal of it is necessary in testing the strength of the People's case, and for the additional reason that all of the other evidence upon which the People relied was circumstantial. Its inherent improbabilities and the fact that it was disbelieved upon the first trial are not otherwise important.

The case which had been presented to the jury and to which the instructions of the court were to be applied was, in brief, the following: Deceased was shown by substantial and uncontradicted evidence to have been a violent man when under the influence of liquor; he had previously assaulted defendant upon several occasions and several times had threatened to kill her; his infatuation for her persisted notwithstanding his marriage and his attentions were forced upon her; on the afternoon of the shooting and again in the evening he had intruded himself into her home and his appearance on the latter occasion had caused defendant's guests to take their sudden departure; his conduct then and upon former occasions had been that of an angry, jealous and violent paramour. Defendant, according to her testimony and also that of Dempsey's widow, had called the latter and asked her to come and get her husband and he had refused to leave defendant's house. Defendant was not shown to have been the instigator of any of her difficulties with Dempsey. The reduced charge of manslaughter relied upon in the second trial was, under the facts of the case, an admission on the part of the People that the shooting had occurred in a quarrel or sudden heat of passion, or in other words that it was voluntary manslaughter.

The shooting having been admitted by defendant, the question of guilt depended upon the claim of justification

or self-defense. No living person other than defendant witnessed the shooting and, aside from the testimony of Essie Dempsey, which we are assuming for the purposes of this opinion was direct evidence, the People depended wholly upon circumstantial evidence to disprove the claim of self-defense. There was nothing inherently improbable in defendant's account of the shooting and it cannot be said from a reading of the record that the jury could not reasonably have reconciled all of the established circumstances with the theory of defendant's innocence. It is because of this state of the evidence that the instructions of the court should be subjected to a critical examination. We have found it necessary to discuss a good many of the instructions given and some of those refused, and our conclusion is that the errors were such as to require a reversal. It is the cumulative effect of numerous errors which forces this conclusion, and we reiterate that we are considering the probable effect of such errors upon the jury's determination of guilt in a case where guilt was not firmly established. We consider it not improbable that a conviction would not have occurred but for the errors to be hereafter discussed. We find appropriate to our discussion the statement of the Supreme Court in *People* v. *Newcomer* (1897), 118 Cal. 263, at 267 [50 P. 405]: "Under these circumstances, if the appellant was justified in killing the deceased, as he might have been, he was in the embarrassing position of one who justly kills another when there is no other witness to the homicide, when he has to admit the homicide and depend greatly upon his own testimony to justify it. In such a case it is evident that a jury will have difficulty in determining the real facts; and in such a case it is apparent that the instructions of the court are very important—particularly when, as in the case at bar, the court instructs at great length. Under such circumstances, any instruction tending to lead the jury from the real issues in question is material, and if erroneous is reversible error."

 Defendant requested, and the court refused to give, the following instruction: "You are instructed that in a trial where circumstantial evidence is relied upon to obtain a conviction, the circumstances must be consistent with the hypothesis that the defendant is guilty and at the same time inconsistent with any other rational conclusion and if you find from the evidence in this case that the evidence is not inconsistent with defendant's innocence, then she is entitled

to an acquittal at your hands.'' This instruction was by no means a model statement of the principle of law which the author doubtless had in mind, but it was as good as any of the People's instructions which we shall discuss, and better than most of them. With slight modification it would have correctly stated a principle of law that was not stated satisfactorily, if it was stated at all, in the instructions that were given. The point to which our discussion of this proposed instruction will be directed is that defendant had a right to an instruction on circumstantial evidence based upon her own theory of the case, which would include the hypothesis that the jury would disbelieve the testimony of Essie Dempsey, leaving the People's case purely one of circumstantial evidence. The slight ambiguities in the requested instruction, which could easily have been corrected, did not justify its rejection and the failure of the court to give an adequate instruction. An instruction was given at the request of the People which defined direct and circumstantial evidence and which concluded with the following paragraph: ''If upon consideration of the whole case you are satisfied to a moral certainty and beyond a reasonable doubt of the guilt of the defendant, you should so find, irrespective of whether such certainty has been produced by direct evidence or by circumstantial evidence. The law makes no distinction between circumstantial evidence and direct evidence in the degree of proof required for conviction, but only requires that the jury shall be satisfied beyond a reasonable doubt by evidence of either the one character or the other, or both.''

The same situation was presented in *People* v. *McClain* (1931), 115 Cal.App. 505 [1 P.2d 1085]. The defendant there had requested an instruction to the effect that a conviction could not be had upon circumstantial evidence unless it was believed by the jury to be irreconcilable with defendant's innocence. In holding that an instruction which was given, which was the same as the one last above quoted, was not the equivalent of the one there requested, and the refusal of which was held to constitute reversible error, the court said (at p. 511): ''—the instruction contains not even a suggestion of the principle of law set forth in the instruction offered by defendant and refused by the trial court. The authorities of this state are unanimous in the declaration of the law that when the evidence in a case is entirely circumstantial and admits either of a theory of the guilt or of the

innocence of the defendant, upon his request therefor, he is entitled to a special instruction embodying the principles set forth in the instruction to which appellant herein has directed attention and of the refusal of which he here complains. (*People* v. *Dick,* 32 Cal. 213; 8 Cal.Jur. 371, and cases there cited.)''

The court gave another instruction at the request of the People, the pertinent portions of which are as follows: ''If the evidence in this case, is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.'' This was no more than an amplification of the general rule that doubts are to be resolved in favor of the defendant. The principle of law stated in the quoted instruction which was refused, and the practice of stating it in a separate instruction, are well established. The requested instruction lays down a specific rule under which circumstantial evidence must be analyzed and weighed. It is true that it has been said that it is a principle that is encompassed within the general doctrine of reasonable doubt and it has been held unnecessary to give it in a case where the latter doctrine has been fully covered by other instructions, but we are not persuaded to that view by anything which has been said upon the subject. (See opinion of District Court of Appeal, adopted by Supreme Court in *People* v. *Van Cleave* (1929), 208 Cal. 295, 301 [280 P. 983].) The opinion in that case does not set out the instructions requested or those given, and we are of the opinion that the fact that the judgment was reversed for other errors would account for the brevity of the attention given to the point and the failure of the court to recognize that the right of a defendant to the specific instruction we are discussing, in a case of circumstantial evidence, has endured for many years and that the courts very generally have regarded it as one which should be given independently of the general doctrine of reasonable doubt.

In *People* v. *Holden* (1910), 13 Cal.App. 354, 359 [109 P. 495], it was said that the rule relating to circumstantial evidence was sufficiently covered by other instructions given, and the court said: ''Where the case rests entirely or chiefly

upon circumstantial evidence, it is desirable that some direction be given the jury as to the necessity for establishing each fact, beyond a reasonable doubt, which is essential to complete the chain of circumstances tending to establish the crime charged. But we are not prepared to say that a refusal to give such an instruction would necessarily be prejudicial error, for the law makes all competent evidence admissible, whether direct or circumstantial, and leaves the jury to determine its relative weight in each case.'' While it would appear that the court was of the opinion that instructions on the doctrine of reasonable doubt were sufficient to cover the principle stated in the refused instruction, it would further appear that the consideration which the court gave to the question of error was doubtless materially affected by the state of the record, for the court said (p. 359): "Furthermore, in the present case, substantially all of the evidence of defendant's guilt was direct, and there was no call for an instruction upon circumstantial evidence."

To the legally trained mind the doctrine of reasonable doubt has a scope much broader than would be easily understood by inexperienced jurors. The rule under which circumstantial evidence is to be weighed is not one which would be suggested to the lay mind by instructions that doubts are to be resolved in favor of the accused. This is sufficiently proved by the fact that through long experience it has become an established practice in the courts to state the rule in distinct and specific form, to serve as an easily understood and safe guide for juries in weighing the sufficiency of circumstantial evidence. Simplicity in the statement of legal principles adds greatly to their efficacy; statements of abstract principles which leave the jury in doubt as to their proper application tend toward confusion. Neither the statement in an instruction that the guilt of the defendant must be established beyond a reasonable doubt, nor the statement that as between two opposing reasonable inferences the one which is consistent with innocence must be preferred to the one tending to show guilt, satisfies the right of the defendant to have the jury instructed that where circumstantial evidence is relied upon by the People it must be irreconcilable with the theory of innocence in order to furnish a sound basis for conviction.

In denying a hearing in *People* v. *Heuss* (1928), 95 Cal. App. 680, 684 [273 P. 583], the Supreme Court made a state-

ment which is applicable to our present discussion. The court referred to the rule of circumstantial evidence which we are discussing as a "well approved and frequently announced statement of the law" and of a modification of the instruction, which left out the statement that circumstantial evidence, to justify a conviction, must be inconsistent with innocence, said: "As a general proposition trial courts should adopt, where practicable, instructions which have become practically standardized by the long approval of appellate courts. The instruction now before us furnishes an apt example. Deviations are usually unnecessary and are not infrequently productive of evil." The ground for denial of the hearing was that the evidence was such that the error was considered not sufficiently grave to result in a miscarriage of justice. See, also, *People* v. *Kinowaki* (1940), 39 Cal.App.2d 376, 380 [103 P.2d 203]. It is scarcely necessary to add that this long established and approved practice in the instruction of juries in criminal cases should not be departed from without mature deliberation and for sufficient reasons. If it is the better practice to state this rule on circumstantial evidence as a distinct guide for juries, the practice has not been robbed of its virtue by having been disregarded occasionally by the courts.

The court in the instant case refused to give instructions requested by defendant, which read as follows: "Actual or positive danger is not indispensable to justify self-defense. The law considers that men, when confronted with danger, are obliged to judge from appearances and to determine from them as to the actual state of things surrounding them and in such case, if a person acts from honest convictions induced by reasonable evidence, as a reasonable man, he will not be held responsible criminally for the mistake as to the extent of the actual danger.

"You are instructed that for a man to avail himself of his right of self-defense, it is not necessary that he shall be in actual danger of death or of receiving great bodily harm. It is sufficient that appearances on the part of her adversary were such as to arouse in his mind, as a reasonable man, that he was about to suffer death or great bodily harm. He may act upon such appearances with safety, and if without fault or carelessness she is misled concerning them, and defends himself correctly according to what she supposes the facts to be, he is justifiable, though they were in truth otherwise,

and though you should further find or believe from the evidence that she was mistaken in her judgment as to such actual necessity at such time and really had no occasion for the use of extreme measures. If you believe from the evidence here that defendant, Inez Hatchett, acted in self-defense from real and honest conviction as to the character of the danger induced by the existence or reasonable circumstances, or if you have a reasonable doubt as to whether she did or did not, then it will be your duty to find that her said act was justifiable even though you might further believe from the evidence that she was mistaken as to the extent of the danger, and it would then be your duty to find her not guilty.''

The four following instructions were given at the request of the People: ''The mere apprehension of danger is insufficient to justify a homicide. The fear, if any, must have been produced by circumstances such as would be sufficient to excite the fears of a reasonable person. The law of self-defense is founded on necessity, and in order to justify the taking of life upon this ground, it must not only appear to the slayer, as a reasonable person, that she had reason to believe, and did believe, that she was in danger of her life, or of receiving great bodily harm, but it must also appear to her comprehension, as a reasonable person, that to avoid such danger it was absolutely necessary for her to take the life of the deceased.

''The Court further instructs the jury that to justify the killing of another in self-defense, it must appear to the slayer, as a reasonable person, that the danger, if any, was so urgent and pressing that in order to save her own life or to prevent her receiving great bodily harm, the killing of the other was absolutely necessary. And it must appear that the person killed was the assailant, or, if not the assailant, that the slayer had really and in good faith endeavored to decline further trouble before the fatal shot was fired.

''To justify a homicide committed by one in resisting or repelling an assault or battery committed or attempted to be committed upon his person by another, it must appear to the slayer as a reasonable person that the danger threatened, if any, was immediate and sufficient to excite the fears of a reasonable person that he or she was in danger of receiving death or great bodily harm, and that he or she acted under the influence of such fears and not in a spirit of revenge;

and it must further appear that the degree of resistance was not clearly disproportionate to the nature of the injury offered or given—that the force used in repelling or resisting the assault or battery was not clearly greater than was apparently necessary.

"A person may have a lively apprehension that he is in imminent danger, and believe that his apprehension is based on sufficient cause and supported by reasonable grounds; that such apprehension is reasonable and warranted from appearances as they present themselves to him. If, however, he acts on these appearances, he does so at his peril, because the law leaves it to no man to be the exclusive judge of the reasonableness of the appearances upon which he acts, but prescribes a standard of its own, which is not only did the person acting on the appearances himself believe that he was in deadly peril of his life or of receiving great bodily harm, but would a reasonable person, situated as the defendant was, seeing what she saw, and knowing what she knew, be justified in believing herself in danger."

Defendant's two proposed instructions which we have quoted should have been given. The second one called for some revision, but as a whole they correctly stated the law. (*People* v. *Miles* (1880), 55 Cal. 207.) If defendant otherwise acted justifiably, her plea of self-defense would not fail merely because the jury may have believed that defendant's danger was not as great as she believed it to have been. It is true that the four instructions given at the request of the People do not incorrectly state the law of self-defense, but they stated the rule negatively and from the viewpoint solely of the prosecution. To the legal mind they would imply that actual or positive danger need not exist in order to justify self-defense, but that principle should not have been left to implication. The difference between a negative and a positive statement of a rule of law favorable to one or the other of the parties is a real one, as every practicing lawyer knows. The rules of law relating to self-defense should not have been stated exclusively from the viewpoint of the prosecution. There should be absolute impartiality as between the People and the defendant in the matter of instructions, including the phraseology employed in the statement of familiar principles. Of instructions that had been given by the court, and which we find upon examination of the original record were identical with the four we have last

quoted, the court said in *People* v. *Estrada* (1923), 60 Cal. App. 477, 483 [213 P. 67]: "The instructions of the court taken as a whole must be said to correctly state the law. While conceding this, it may be added that in their tenor the instructions of the court were critical of the self-defense claim. The court might well have given more comprehensive instructions on the right of self-defense as viewed from the standpoint of the accused." It would seem that the criticism of the instructions in the Estrada case, which came up from Los Angeles County, called for their revision and the use of instructions on self-defense which stated the law with complete impartiality.

In addition to the foregoing instructions on justification, the court gave another reading as follows: "The Court instructs the jury that if from the evidence you believe that, without any overt act or physical demonstration upon the part of the deceased sufficient to warrant the defendant, as a reasonable person, in believing that she was in great bodily danger, she, the defendant, fired the fatal shot at deceased and killed him, such killing under such circumstances was not justifiable." This instruction was wholly unnecessary and it emphasized the fact that the court was viewing the claim of self-defense exclusively from the viewpoint of the prosecution. If we were considering any one of these instructions separately, even including the last one, the harm would not be so serious, but the five instructions together, we think, in the absence of a statement of the law of self-defense from the viewpoint of the defendant, tended to create the impression in the minds of the jury that the judge was of the opinion that self-defense had not been established.

The jury were not instructed that defendant was accused of manslaughter and not murder, an omission which is pertinent to our discussion of the next point.

An instruction, given at the request of the People, reads as follows: "You are instructed that manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion.

"2. Involuntary—in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.

"The words 'malice' and 'maliciously' import a wish to vex, annoy or injure another person, or an intent to do a wrongful act established either by proof or by presumption of law.

"Manslaughter is principally distinguishable from murder in this: That though the act which occasioned the death be unlawful or likely to be attended with bodily mischief, yet the malice, either express or implied, which is the essence of murder, is presumed to be wanting, and the act being imputed to the infirmity of human nature, the correction for it is proportionately lenient.

"And when the mortal blow, though unlawful, is struck in the heat of passion, excited by a quarrel, sudden and of sufficient violence to amount to adequate provocation, the law, out of forebearance for the weakness of human nature, will disregard the actual intent, and will reduce the offense to manslaughter. In such case, although the intent to kill exists, it is not that deliberate and malicious intent which is an essential element in the crime of murder.

"Heat of passion is defined as such a passion as would naturally be aroused in the mind of an ordinary, reasonable person under the given facts and circumstances, and consequently no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinary reasonable man.

"While no particular cause for such heat of passion is expressly prescribed by law, there must be provocation of such character as is naturally calculated to arouse passion, and it must appear that the defendant acted under the smart thereof.

"There must be considerable provocation, sufficient at least as would stir the resentment of a reasonable man. A provocation of slight and trifling character, such as words of reproach, however approbrious or grevious they may be, or gestures without an assault upon the person, nor any trespass against lands or goods, are not recognized as sufficient to arouse in a reasonable man such passion as has heretofore been defined to you."

Defendant could not have been convicted of a higher crime than manslaughter, and when that crime was charged by the amended information it constituted an admission by

the People in view of their theory of the case that the killing had been done upon a sudden quarrel or in the heat of passion. There was no necessity for a definition of ''heat of passion'' or of ''legal provocation'' or for the definition of ''malice'' which were all a part of the differentiation of manslaughter from murder. If the jury had found adversely to defendant under these definitions there could not have been a conviction of a crime greater than manslaughter. All of this extraneous matter could only have tended to confuse the jury. ■ Furthermore, by this definition of involuntary manslaughter the jury were told in so many words that the commission of a lawful act which might produce death, in an unlawful manner, or *without due caution and circumspection,* would amount to manslaughter or, in other words, that the act of shooting, if believed lawful, might constitute the offense of manslaughter if it was done in an unlawful manner or without due caution and circumspection. Any such theory of guilt would have been entirely unsupported by the evidence or any legitimate inferences to be drawn therefrom. The instruction clearly tended to divert the minds of the jury from the sole question whether defendant acted reasonably and in good faith in defending herself from a felonious attack and may well have operated to her prejudice. It must be assumed that the jurors endeavored to the best of their ability to apply to the facts of the case the principles of law stated in the instructions. It may not be assumed that they undertook to decide for themselves that any legal principle stated by the court had nothing to do with the case. The giving of the definition of involuntary manslaughter could be said to have been harmless only upon the assumption that the jury understood its irrelevancy and disregarded it. Of course the matter cannot be put aside upon the theory that the jury understood better than the judge and the district attorney that the case involved none of the elements of involuntary manslaughter. Defendant requested, and the court declined to give, an instruction to the effect that if the appearances were such as to justify the killing in self-defense, defendant was not required to exercise any due care or circumspection in the killing. No definition of involuntary manslaughter should have been given at all, but since one was given and defendant requested an instruction for the purpose of curing the error, the latter instruction should have been given. Its refusal suggests that the case was one

in which there could be a conviction of involuntary manslaughter, which belief has no support in the record. The belief that the jury could easily have been misled by the instruction is not farfetched. We note that in 1905 a superior court judge instructed a jury to the effect that the defendant could be acquitted of manslaughter by shooting, upon the ground of self-defense, where there was in fact no actual danger, only in the event that the killing was done with due caution and circumspection and not in a sudden quarrel or heat of passion. In reversing the conviction the Supreme Court said: "If the appearances are such as to justify a reasonable man in believing that it is necessary to instantly kill another in order to save himself from death or great bodily injury, and he does so believe, he is not required to exercise any 'due care' or 'circumspection' as to the manner of killing." (*People* v. *Thomson* (1905), 145 Cal. 717, at 721 [79 P. 435].)

■ Another instruction was given in this case which read as follows: "The acts which a defendant may do and justify under a plea of self-defense depend primarily upon his own conduct, and secondarily upon the conduct of the deceased. There is no fixed rule applicable to every case, though certain general principles, well established, stand forth as guides for the action of men, and measures for the jury's determination of their deportment.

"Self-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault, to create a real or apparent necessity for killing."

The first two sentences of the instruction, by themselves, state no legal principle and as used were meaningless, although they aptly introduced the discussion of the principles of self-defense on pages 462 et seq., in *People* v. *Hecker* (1895), 109 Cal. 451 [42 P. 307, 30 L.R.A. 403]. ■ We find nothing in the evidence, direct or circumstantial, suggestive of the situation described in the concluding sentence of the instruction. Deceased entered defendant's house as an intruder and his appearance caused her guests to leave. No one but defendant knew or testified as to the circumstances of the shooting. If the jury believed her she should have been acquitted upon the ground that she acted in self-defense. But this instruction invited speculation as to whether defendant had sought a quarrel with deceased in order to create

a real or apparent necessity for killing him. Such a conclusion would have been unjustified under any possible construction of the evidence. The facts of the case bore no resemblance to those in *People* v. *Robertson* (1885), 67 Cal. 646 [8 P. 600], or *People* v. *Glover* (1903), 141 Cal. 233 [74 P. 745], where there was occasion for the application of the principle stated in the instruction. The suggestion of this untenable theory of guilt was error.

The court gave an instruction on justification for homicide which purported to be a copy of section 197 of the Penal Code, much of which was irrelevant, but which included the following: "Homicide is justifiable . . . when committed in the lawful defense of such person . . . but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in *mortal* combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed." The code section specifies *mutual* combat, not *mortal* combat. In the original code section the word "mortal" was used, but, as stated in *People* v. *Fowler* (1918), 178 Cal. 657, 671 [174 P. 892], the word "mutual" was no doubt intended, since it is *mutual* combat or combat entered into voluntarily, and not *mortal* combat, from which one must endeavor to withdraw before taking the life of his adversary. The section was amended in 1931 to state the true rule. In *People* v. *Fowler, supra,* the giving of the same instruction was excused upon the ground that it was in the words of the statute, and it was held that defendant could not complain where he had not requested a corrective instruction. But no such excuse appears here for the use of the words "mortal combat" in the instruction, for which the correct words "mutual combat" were substituted by the Legislature more than twelve years ago. Defendant might have been engaged in "mortal" combat even though she were not the aggressor. According to her own testimony she was so engaged, not as the aggressor or voluntarily, but under circumstances which did not compel her to retreat, and yet by this instruction the jury were told, in effect, and without qualification, that it was her duty to retreat or to attempt to retreat before she shot. Even if the word "mutual" had been used instead of "mortal" there still would have been no evidence to which the instruction could have applied. The jury were instructed separately that defendant, when attacked, had a right to stand her

ground and defend herself, but that instruction did not cure the error of the one under discussion and at most only created an irreconcilable conflict and one which constituted serious error.

 Section 197 of the Penal Code provides that homicide is justifiable "when committed in defense of . . . person, against one who manifestly intends *or* endeavors, by violence or surprise, to commit a felony. . . ." The instruction as given in the present case used the words "intends *and* endeavors." Under the law one has a right to defend his person against another who manifestly intends to commit a felony, as well as against one who endeavors by violence or surprise to commit it, and, without entering upon a discussion as to the meaning of the word "manifestly" as used in the statute, we have no hesitation in holding that the instruction as given was distinctly in error upon a vital issue in the case. Under the third subdivision of section 197, homicide is justifiable in lawful defense of the person "when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished" etc. Under such circumstances justification exists by reason of appearances which furnish reasonable grounds for apprehending the assailant's design and also imminent danger of its accomplishment. The word "endeavors" is not used, as it is in the preceding paragraph which we have quoted. The substitution of "and" for "or" as above noted created a conflict in the instructions on self-defense which we have hereinbefore quoted, by adding the element that deceased must have endeavored to commit a felony and may have led the jury to believe that his actions short of an actual endeavor to commit a felony or to do great bodily injury would not have justified the shooting. The jury may well have believed that even if deceased pointed the gun at defendant he did not intend or endeavor to shoot her, or they may have believed that even though he came toward her with the upraised smoking stand, he was endeavoring to frighten her rather than to strike her with it. Defendant had testified that on that day deceased had twice exhibited a knife without attempting to use it and had threatened her with a vase without striking her. As we have already pointed out, the issue of justification depended not upon the existence of actual danger but upon appearances. This alteration in the language of section 197 could have been understood as

placing the defendant under the necessity of proving that there was actual danger consisting of an endeavor to commit a felony, in addition to the existence of reasonable grounds for apprehending imminent danger. If the instructions that were given on justification had been in proper form it would not have been necessary in this case to instruct as to a situation where the deceased manifestly intended or endeavored to commit a felony, but if the latter definition of justification was to be given at all, it should not have been given in distorted form and in contradiction of correct statements on the same subject.

Section 197 contains many provisions which could have had no possible application to the case on trial, which we will not undertake to enumerate. Only the pertinent provisions should have been stated to the jury. It is well understood that instructions upon irrelevant matters are "calculated to mislead the jury by diverting their minds from the true issue before them for trial." (8 Cal.Jur. 322.)

In conclusion we should add that we are not basing a reversal upon any single error among those which we have discussed. We regard all of them as substantial, although some are considerably more serious than others. No conviction by a jury instructed as this one was should be allowed to stand, except upon evidence of guilt so strong as to compel an affirmance under section 4½, article VI, of the Constitution. The evidence was sufficient to justify defendant's conviction but not sufficient to clearly establish her guilt.

The judgment and the order denying defendant's motion for a new trial are reversed.

Desmond, P. J., concurred.

BISHOP, J. pro tem.—I concur in the judgment because of errors of commission. In *People* v. *Silver* (1940), 16 Cal.2d 714, 722 [108 P.2d 4], where the defendant had been charged with murder and convicted of manslaughter, the trial court had given instructions on self-defense, although the defendant had made no claim that he had acted in defense of self. Our Supreme Court, referring to these instructions, stated (p. 722) : "We are of the opinion that the instructions were erroneously given. When the charge to the jury, though a correct statement of legal principles, is extended beyond such limitations so as to cover an assumed issue which finds no

support in the evidence it constitutes error. (*People* v. *Savinovich*, 59 Cal.App. 240, 244 [210 P. 526].)'' Later in its opinion (p. 723) the Supreme Court stated: ''Where errors in instructions occur, the question always arises as to whether or not they are prejudicial. Here it may be said that where the proof of a defendant's guilt is clear, and no extenuating circumstances appear, such errors may not be prejudicial. But where a case, such as the one at bar, is what may be termed a 'close' case, and where the erroneous instructions concern matters vital to the defense of the defendant, and may have resulted in a miscarriage of justice, we are of the opinion that such errors must be regarded as prejudicial and should result in a new trial for the defendant.''

As appears clearly from the majority opinion, under the facts of this case it was error to give the lengthy, philosophical, instruction distinguishing manslaughter from murder and dealing so extensively with involuntary manslaughter. It was error to give the instruction applicable only to a defendant who had designedly sought a quarrel. It was error to give the anachronistic instruction involving ''mortal'' combat. The case against the defendant was a close one, bringing it within the principle expressed in the quotations from the Silver case.

The judgment should be reversed, therefore, because of the errors committed in giving the inappropriate instructions. I find no error to exist, however, in the trial court's failure to give the first of the three instructions referred to in the majority opinion, looked at in the order in which they are discussed, for it is an incorrect statement of a principle of law which was adequately covered by other instructions which were given. Had it been given the jury would have been told: ''If you find from the evidence in this case that the evidence is not inconsistent with defendant's innocence, then she is entitled to an acquittal at your hands.'' The instruction considered in the case of *People* v. *McClain* (1931), 115 Cal.App. 505, 510 [1 P.2d 1085], contained no such erroneous passage. Where a requested instruction contains an erroneous statement it is not error for the trial court to refuse to give it as requested and it is under no duty to correct it and give it as modified (*People* v. *Megladdery* (1940), 40 Cal.App.2d 643, 653 [105 P.2d 385]; *People* v. *Housman* (1941), 44 Cal.App.2d 619, 628 [112 P.2d 944]), unless, of course, it deals with a subject concerning which it is the

court's duty, in the absence of any request, itself to frame and give an instruction.

Of greater importance, the principle which the first half of the rejected instruction indicates was its subject matter, was adequately covered by other instructions which were given. We note this one which was given: "If the evidence in this case, is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.

"You will notice that, in this instruction, this rule of law is made applicable to cases in which there are two opposing interpretations, each of which appears to you to be reasonable.

"This rule of law does not apply in a case where there are two opposing constructions sought to be placed upon the evidence, one of which appears to you to be reasonable and the other to you appears to be unreasonable.

"In the latter case it would be your duty, under the law, to adopt the reasonable construction and reject the one which, in your judgment, appears to be unreasonable."

It is true that this instruction is not limited to circumstantial evidence, but "the greater includes the less," and has judicial approval. In *People* v. *Holden* (1910), 13 Cal. App. 354 [109 P.2d 495], an instruction numbered 20 had been requested but not given. It is unnecessary to quote it fully; its theme is discoverable from its concluding sentence: "No other conclusion but that of the guilt of the accused must fairly and reasonably grow out of the evidence, but the facts must be incompatible with innocence, incapable of explanation upon any other reasonable hypothesis than that of guilt." The appellate court made this comment upon the trial court's refusal to give it (p. 359): "Instruction 20, asked by defendant and refused by the court, correctly stated the law as to circumstantial evidence, but we do not think that the defendant was prejudiced because not given. They were many times and in various forms told that they must be guided wholly by the evidence and such instructions embraced all the evidence, direct and circumstantial. Where the case rests entirely or chiefly upon circumstantial evidence, it

is desirable that some direction be given the jury as to the necessity for establishing each fact, beyond a reasonable doubt, which is essential to complete the chain of circumstances tending to establish the crime charged. But we are not prepared to say that a refusal to give such an instruction would necessarily be prejudicial error, for the law makes all competent evidence admissible, whether direct or circumstantial, and leaves the jury to determine its relative weight in each case. When, therefore, full instructions were given that the jury must be guided entirely by the evidence, and must be convinced by it beyond a reasonable doubt, the instruction goes to both classes of evidence, and it must be assumed that the jury will so apply it.''

The trial court, furthermore, gave the instruction on presumption of innocence and reasonable doubt in the language of section 1096, Penal Code. This, our Supreme Court has said, sufficiently covered the subject we are now discussing. In *People* v. *Van Cleave* (1929), 208 Cal. 295 [280 P. 983], this instruction was one of five requested but not given:

''If the evidence relating to any or all the circumstances in this case is, in view of all the evidence, susceptible of two interpretations, one of which would point to the defendant's guilt and the other would admit of his innocence, then it is your duty in considering such evidence to adopt that interpretation which will admit of the defendant's innocence and reject that which would point to his guilt.'' In its opinion, the Supreme Court stated (p. 301): ''Appellant asked the trial judge to give five instructions each of which, he says, was designed to inform the jury 'that conviction on circumstantial evidence must exclude any and every reasonable hypothesis of innocence based on the adduced facts,' and each of them was refused. We think the proffered instructions, although they were differently phrased, related only to the question of reasonable doubt, and the judge instructed the jury amply upon that subject. The requested instructions were, therefore, unnecessary.''

Because it may be of moment on a retrial of this case I think another matter should be spoken of. The actual conflict in the evidence in this case lies between defendant's direct evidence and the mixed direct and indirect evidence of Mrs. Dempsey. If the latter is to be believed the defendant stated, in effect, that she was going to kill Dempsey and then proceeded to do so. This testimony would not prove man-

slaughter, but murder; yet it would be evidence upon which a conviction of manslaughter might rest. (*People* v. *McFarlane* (1903), 138 Cal. 481, 482-487 [71 P. 568, 72 P. 48, 61 L.R.A. 245]; *People* v. *Huntington* (1908), 8 Cal.App. 612, 614-620 [97 P. 760].) By filing an amended information charging manslaughter, the People have made no admission which precludes them from proving that the defendant murdered Dempsey, even though it be held that she cannot be convicted of a higher homicide than manslaughter.

A petition for a rehearing was denied March 13, 1944, and respondent's petition for a hearing by the Supreme Court was denied March 30, 1944.