[Crim. No. 650.   Fourth Dist.   Apr. 23, 1947.]

THE PEOPLE, Respondent, v. ROBERT L. WEBSTER, Appellant.

322

James Munholland for Appellant.

Fred N. Howser, Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Respondent.

MARKS, J.—Defendant was convicted of murder of the first degree with the penalty fixed at life imprisonment. He has appealed from the judgment pronounced upon him and from the order denying his motion for new trial.

Two errors are alleged here as grounds for a reversal of the order and judgment. The first involves evidence of a separate crime committed on the person of Alice Sullivan, and the second is the refusal of the trial judge to give instructions on circumstantial evidence proposed by defendant.

Defendant was accused and convicted of murdering Carrie D. Bendel, a young woman nineteen years of age. In order to determine the admissibility of the evidence of the separate crime committed by defendant it is necessary to particularize the evidence concerning both offenses in order to determine if there runs through both of them a common plan or scheme which would make the evidence of the assault made on the Sullivan girl admissible in his trial for the murder of Carrie D. Bendel. (*People* v. *Albertson*, 23 Cal. 2d 550 [145 P.2d 7].)

Carrie D. Bendel was a waitress employed at Serwell's Cafe in Belmont Shore in the city of Long Beach. On June 30, 1946, she went off duty shortly after two o'clock in the afternoon and proceeded to the El Sombrero, a cocktail bar a short distance from Serwell's. She was dressed in her white uniform. She seated herself at the bar and ordered a drink. Defendant, who did not know Miss Bendel, was seated at the bar a short distance from her. They engaged in conversation and defendant moved to the stool next hers. They remained thus seated for some time and were served several drinks. They left the El Sombrero together. Miss Bendel changed to street clothes consisting of a blouse or sweater, a dark skirt and a coat of a checked pattern. They probably returned to the El Sombrero and probably had another drink there. They appeared in Lashley's Cafe about nine o'clock p. m. and were served dinner which the waitress who served them was able to describe in detail. They left Lashley's together at about ten o'clock. Numerous witnesses testified to these facts so that the testimony of defendant and his statement to officers at the time of his arrest to the effect that he did not know Miss Bendel, had never seen her and had not been in the El Sombrero cocktail bar would seem to be fabrications.

Miss Bendel was not thereafter seen alive. Her body was found next morning by Refugio and Helen Medina. These two left their home in Stanton on the morning of July 1st, at about 5:30 o'clock. They drove from their home to the Katella Road, a paved road that runs east and west near Los Alamitos in Orange County. They turned south off of Katella Road onto a dirt road that led to the Buehler farm where Mrs. Medina worked. About sixty feet south of the Katella Road they saw a body lying face down on the weeds immediately west of this road and next to a wire fence and a eucalyptus grove. They called Mrs. Buehler, who went to the scene and then called the police officers of Orange County. Two deputy sheriffs immediately responded and others arrived later.

The body was subsequently identified as that of Carrie D. Bendel. It was nude from the waist down. On turning it over numerous bruises, scratches and abrasions were seen on the face. On one side of the throat was the imprint of a thumb and on the other the imprint of four fingers. The autopsy disclosed that death had been caused by strangulation. Remnants of the food which the waitress testified she

had served Miss Bendel in company with the defendant were found in deceased's stomach. The autopsy surgeon was of the opinion that death had ensued not more than four hours after the food had been eaten.

The officers found a woman's patent leather pump on the east side of the dirt road opposite the body, and Miss Bendel's purse about twenty-eight feet from the body. This purse had on it a clear fingerprint which was later identified as the print of the index finger of defendant's right hand. Miss Bendel's brassiere and slip were torn in two down the front of her waist, leaving the upper portion of her chest bare.

There were tire tracks of an automobile which had been backed from where the body lay out onto Katella Road. The imprint on the pavement of the left rear tire was clear enough to be photographed. This print was later found to correspond to the tread of the tire on the left rear wheel of defendant's automobile. However, it should be observed that this tire was a retread with a not uncommon type of tread.

We will now consider the attack made on Alice Sullivan to determine if there was sufficient similarity in the two attacks to show a common scheme or plan to make the evidence of the Sullivan attack admissible in the prosecution for the murder of Miss Bendel.

Miss Sullivan and a Miss Fulton were employed at the Iceland Skating Rink in Hynes. They finished their work at about 10:30 o'clock on the night of August 9, 1946, and went to Sherry's Barn. They sat down at a table and ordered some drinks. Defendant, with whom they were not acquainted, was seated at another table. He came over and joined them. He danced with Miss Sullivan until the place closed at midnight. Two other young men attempted to join the party but were repulsed. When the place closed the two women and defendant went to the place where Miss Sullivan's Chevrolet coupe was parked and Miss Fulton suggested that the three go to her house for sandwiches and coffee. The two unidentified young men approached and again asked to join the party but were again refused. The two women proceeded to Miss Fulton's home in Miss Sullivan's car, being followed by defendant in his automobile and the two strangers in a third car. Miss Sullivan parked her car on the left hand side of the street in front of Miss Fulton's home with the other two cars parking to the rear of her car. Miss Fulton alighted and went into the house. Miss Sullivan got out and was again

approached by the two strangers with a renewal of the request that they be permitted to join the party. Defendant came up and he and Miss Sullivan finally convinced them they were not wanted. According to Miss Sullivan this was the last seen of the two men.

Miss Sullivan and defendant then entered the house where Miss Fulton was preparing coffee and sandwiches, of which the three partook until some time between 2:30 and 3:30 in the morning on the 10th of August. They were joined by Miss Fulton's brother and another man. According to the evidence no liquor was consumed at this house.

Miss Sullivan and defendant left and went to her car. Defendant suggested that he follow her home in his car as the hour was late. Miss Sullivan did not think this necessary. They both got into her coupe, Miss Sullivan sitting in the driver's seat and defendant to her right with his left arm along the top of the seat behind her. After they had each smoked a cigarette his left hand came up onto her head with the thumb pressing her temple with sufficient force to leave a bruise and his right hand on her throat. He choked her into unconsciousness. When Miss Sullivan regained consciousness defendant was driving the car and she was sitting on the seat at his right. He again choked her into unconsciousness. When she came to she was slumped on the floor of the car with her knees under her chin and her back against the door. Defendant had left. She managed to blow the automobile horn. She unlatched the door and fell onto the road where she remained until neighbors who had been aroused by the horn found her about five o'clock in the morning. They summoned officers who took Miss Sullivan to a hospital.

Miss Sullivan was wearing a white blouse, an underskirt, a skirt, a brassiere, a foundation garment or girdle, a sanitary belt and pad. The brassiere was ripped, the girdle and sanitary belt had been twisted around and the pad was found in the glove compartment of her car. One sleeve had been torn from the blouse and the blouse had been ripped down the front of the waist.

One of the officers called to the scene described Miss Sullivan's condition as follows:

"A. We arrived and found that the victim was in need of medical care, and on our examination we found her blouse had been ripped or torn from her, her tongue was swollen, and there were bruises on the left side of her temple, and her

throat had marks upon it, and her blouse as I said before was torn from her. Q. How about these marks on the throat? Where on the throat were they? A. Well, there was a large bruise mark on the right side of her throat and several bruises on the left side of her throat. Her head had a rapidly rising swelling near her forehead.''

The elements necessary to be established in order to permit evidence of a collateral offense to be admitted against a defendant on trial for another offense are thus stated in *People* v. *Albertson, supra,* at page 578:

''These momentous consequences demand a rigorous enforcement of the rule, in criminal charges, that evidence of the collateral offense must never be admitted, unless it can be applied to more certainly demonstrate the truth. Hence: (a) Ground must first be laid implicating the accused in the charge under trial, and unless sufficient evidence of this has been, in the opinion of the trial judge, first adduced, all evidence of other offenses must be excluded; (b) the collateral offense cannot be put in evidence without proof that the accused was concerned in its commission; (c) there must be identity of person or crime, scienter, intent, system, or some integral parts of the exceptions established between the charge under trial and that sought to be introduced, that clearly connects the accused, showing that the person who committed the one crime must have committed the other.''

The evidence before us concerning both offenses involved here is sufficient to satisfy the requirements of these rules. Defendant was sufficiently connected with and implicated in the offense for which he was on trial. It was thoroughly established that he spent the afternoon and evening of June 30th with deceased; that he had dinner with her is established by the testimony of the waitress who served them and the remnants of this meal found in her stomach by the autopsy surgeon. The tire track on the road corresponded with the tread of one of the tires on his automobile. Most convincing is his fingerprint found on the purse of deceased. That defendant was concerned in the assault on Miss Sullivan was sufficiently established by her identification of him as her assailant. There was a similar plan or scheme or system appearing in both offenses. Defendant ''picked up'' both women in cocktail bars and spent considerable time drinking with them. Both women had bruises and abrasions on their heads. Both women were cruelly choked, evidently with the right

hand of their attacker,—one to death and the other into a state of collapse and unconsciousness. The garments of both were torn open, leaving the upper portion of the front of the torso exposed. It would be unusual to find two crimes with greater details of similarity of execution, showing a common plan or scheme or system in the commission of both. Thus the evidence of the collateral crime was properly admitted. (*People* v. *Lisenba,* 14 Cal.2d 403 [94 P.2d 569]; *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924]; *Lisenba* v. *People,* 314 U.S. 219 [62 S.Ct. 280, 86 L.Ed. 166].) █ That the collateral crime was committed after the commission of the offense for which defendant was on trial does not in itself furnish sufficient reason for rejection of the evidence concerning it. (*People* v. *Gosden,* 6 Cal.2d 14 [56 P.2d 211].)

█ The most serious question presented on this appeal is the refusal to give defendant's requested instructions numbered 22 and 23 which read as follows:

"When the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt."

"I instruct you further that you are not permitted, on circumstantial evidence alone, to find the defendant guilty of the crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion."

It is now established in California that in cases like the one before us where the case of the People rests entirely on circumstantial evidence instructions such as those quoted should have been given. (*People* v. *Hatchett,* 63 Cal.App.2d 144 [146 P.2d 469]; *People* v. *Rayol,* 65 Cal.App.2d 462 [150 P.2d 812]; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Koenig,* 29 Cal.2d 87 [173 P.2d 1].) In the Koenig case it was said:

"The failure either to give the requested instruction or to include in the instruction given a proper statement of the principle that the evidence must be inconsistent with any other rational hypothesis was error. It does not follow, however, that error in this regard necessarily requires re-

versal of the trial court. In the Bender case, it was held that the failure to give a complete instruction was not prejudicial under the facts in that case. Similarly in the present case such failure was not prejudicial. It is true that in *People* v. *Rayol,* 65 Cal.App.2d 462 [150 P.2d 812], the court held that the failure to give the complete instruction was prejudicial, but a conviction in that case involved the state's proving that the defendant knew that she had participated in an act of sodomy although she was under the influence of intoxicating liquor at the time, and the evidence was confined almost entirely to her participation. The jury could reasonably have concluded that defendant was not a knowing participant in the act. In *People* v. *Hatchett,* 63 Cal.App. 2d 144 [146 P.2d 469], the court also held that the failure to give the complete instruction was error, but it did not reverse on this error alone but on this error and several other errors that were substantial.''

Thus it must be admitted that the failure to give the requested instructions was error. However, it clearly appears from the foregoing cases that the failure to give such instructions is not always sufficiently prejudicial to require a reversal of the judgments.

Here the trial judge properly instructed the jury on reasonable doubt and properly defined direct and circumstantial evidence. He also gave defendant's requested instruction number 24, as follows:

''If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of defendant's innocence, and reject that which points to his guilt.

''You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable.''

As we have already observed all of the evidence in this case connecting defendant with the murder of Carrie D. Bendel was circumstantial. There was no direct evidence that he killed her. If instruction number 24 had opened with the statement to the effect that all of the evidence in this case

was circumstantial and the word "circumstantial" had been inserted before the word "evidence" in the first line, it would have been a sufficient statement of the law under the cited decisions which require the jury's attention be directed to this rule of law. However, all of the evidence was circumstantial and the jury must have been aware of that fact under the definition of circumstantial evidence which the trial judge gave. Jurors are presumed to be persons of average intelligence and the mere statement in instruction number 24 to the effect that all the evidence was in fact circumstantial, and reference to that circumstantial evidence could add nothing to the knowledge gained through several days of trial, during which time the jurors listened to nothing but circumstantial evidence. As reasonable persons they could conclude that instruction number 24 referred to nothing but circumstantial evidence as there was no other evidence introduced connecting defendant with the murder. Therefore we cannot conclude that the jury was misled by the instructions given or that the failure to give defendant's requested instructions numbered 22 and 23 was sufficiently prejudicial to warrant a reversal of the judgment.

Further, we have studied the entire record and are left with the firm conviction that there has been no miscarriage of justice in this case. Thus we are prohibited from reversing the judgment by section 4½ of article VI of the Constitution.

The judgment and order denying the motion for new trial are affirmed.

Barnard, P. J., and Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 22, 1947. Carter, J., voted for a hearing. Schauer, J., also voted for a hearing solely for the purpose of noting that the dictum "If instruction Number 24 had opened with the statement to the effect that all of the evidence in this case was circumstantial and the word 'Circumstantial' had been inserted before the word 'evidence' in the first line, it would have been a sufficient statement of the law under the cited decisions which require the jury's attention be directed to this rule of law," is inconsistent with the holding in *People* v. *Bender* (1945), 27 Cal.2d 164, 175 [163 P.2d 8], and the cases there cited.