[Crim. No. 9755.   Second Dist., Div. Three.   Sept. 28, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT LESLIE WEBSTER, Defendant and Appellant.

Richard M. Moore, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

FORD, P. J.—In a trial by jury the defendant was found guilty of murder in the first degree. The penalty was fixed as life imprisonment. He was sentenced to be punished by imprisonment in the state prison for the term of his natural life. He has appealed from the judgment.

Three contentions are made: 1. The defendant's statement that he had choked the victim, Diane Harley, was received in violation of the *Escobedo-Dorado* rule (*Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]). 2. Evidence that in 1946 the defendant had killed a woman in Orange County was erroneously introduced by the prosecution. 3. Evidence that the defendant told the victim, Diane Harley, that he was a captain in the Narcotics Division of the Long Beach Police Department and was working on an important case should have been excluded. A resume will be given of portions of the evidence in the light of which such contentions must be determined.

Edith L. Harris, who resided in the apartment adjoining

that in which Diane Harley lived, testified that on the morning of September 5, 1963, she saw Mrs. Harley's body on the ground in the rear area of the premises. Nora B. Sommer testified that on that morning she saw Mrs. Harley's purse on the driveway and her shoes in the grass a few inches away from the driveway.

Sergeant Welch of the homicide detail arrived shortly after 9 a.m. Portions of his testimony were as follows: ''I noticed the body of what appeared to be a woman lying with the head toward the west near the grape stake fence which is located at the end of the garages in the rear of this address. The body had the head toward the west and feet were toward the east and spread apart. The dress was pulled up above the hipline exposing the nude body of this woman, lying down. . . . I noticed an abrasion on the forehead near the right eye just directly between the eyebrow and the ear and there was a small quantity of blood about this area. I noticed that the throat had bruises on the front portion of the throat or what appeared to be bruise marks. There were several of these marks and spaced apart. I noticed that both legs were spread apart. There was no stocking or shoe on the left leg. The right leg had a portion of the stocking still on the right foot. There was no shoe on the foot. The stocking was torn or appeared to be torn and extended toward the left foot and attached to the stocking was what appeared to be a black woman's panty girdle. It was still attached to the stocking by the garter clasp. I noticed that there was a second stocking attached to the other side of the girdle also by a garter clasp. The girdle appeared to be turned inside out. . . . The indentations were in the ground. The ground, incidentally, was damp as it had rained a day or two prior to this and the ground was still damp and muddy. There were two indentations between the feet of the body of the woman lying there. These indentations were round and approximately an inch and a half to two inches in width. The eastern portion of this indentation was deeper and the ground appeared to have been pushed backwards. There were two other indentations closer to the pelvic region of the body. These indentations were up towards the knees and were round, not wide and deep. They were approximately three inches in diameter. I concluded at this time that this woman was definitely dead. . . . There was some other shrubbery which was growing behind the location where the head of the woman was located and to the north there were some tomato plants growing. I saw one tomato on the ground

and it appeared to have been mashed by some means or other.''

J. McKowan, a bartender at the Broadway Cafe, testified that on September 4, 1963, he saw the defendant in the bar at approximately 4:30 p.m. Mrs. Harley came in and sat at the bar at approximately 5 p.m. The defendant immediately moved to the seat beside her. The witness went off duty at about 6 p.m. Another bartender, Don L. Newman, testified that he was in the bar but was not working. When he left the bar between 10:30 and 11 p.m. the defendant and Mrs. Harley were still there. His opinion was that they were sober just before he left.

James W. Short testified that he arrived at the Broadway Cafe at approximately 5:45 p.m. on September 4, 1963. The defendant was sitting next to Mrs. Harley. A portion of the record as to his testimony is as follows: ''Q. During the conversation was there some discussion or talk about the defendant's occupation? A. Yes, sir. I mentioned about or asked him what kind of work he did. MR. MEAD [deputy public defender]: Objected to as immaterial what his occupation was. THE COURT: Overruled. THE WITNESS: I asked him what kind of work he did and his answer was that he was a Captain in the Narcotics Division of the Long Beach Police Department.'' Between 10:30 and 11 p.m. the witness became aware that the defendant and Mrs. Harley were no longer in the bar.

Dr. Kade, who was a deputy medical examiner and senior grade autopsy surgeon, testified that on September 5, 1963, he performed an autopsy on the body of Mrs. Harley. Portions of his testimony were as follows: ''Based on the autopsy findings it is my opinion that the death of this person, Diane J. Harley, resulted from asphyxia due to manual strangulation, that is, being choked or throttled with a hand, one or more hands . . . . My conclusion that the death of this woman resulted from being strangled with a hand is based upon my observations of abrasions and contusions, that is, scratched and scraped areas and bruised areas of the skin of the neck and a fracture of the right side of the hyoid bone, that is, a break in the hyoid bone which is a C-shaped curved bone at the base of the tongue, high up in the neck, and a fracture of the cricoid cartilage which is a part of the Adam's Apple, or part of the voice box cartilage. . . .''

Dr. Kade further testified that he found ''the presence of large numbers of human spermatazoa in the vagina,'' which indicated that ''this person was the recipient of a sexual act sometime within the recent past.'' He observed ''no evidence

of injury to any of her female organs or private region.'' The chemical analysis revealed the presence of 0.21 percent of alcohol in her blood, which meant that she was drunk.

Ralph I. Simonds, a criminalist employed by the Long Beach Police Department, testified that he gathered samples of the soil where Mrs. Harley's body was found. He was at the defendant's home the night the defendant was arrested and immediately after the arrest he made an investigation. The officers found a pair of wet trousers ''which had been rolled up and stuffed in between the north wall of the cabinet and the water heater.'' After the pants were dried in the witness' laboratory he examined them. A portion of his testimony was as follows: ''There was tomato seed and a small portion of tomato fibre that was on the bottom of the pant leg inside where the cloth is turned under the inside of the pant leg to form the double thickness for the cuff.'' He further testified: ''I saw tomato seeds at the time and place of [sic] the morning of the 5th of September about 8:00 o'clock, a considerable [number] of tomato plants growing there. There were broken in areas [sic]. Some of the tomatoes had fallen on the ground and had been stepped on.'' He examined the trousers for soil content, a part of his testimony being as follows: ''There seems to be a deeper coloring in this area about the knee and slightly below. By coloring I refer to a soiled mark, dirt mark.''

Mr. Simonds testified as to his examination of Mrs. Harley's stockings: ''I examined the bottom of both stockings in the laboratory the day after or the next day after that. I found nothing on either one of these stockings which would indicate that the subject had walked on those stockings. I say 'nothing.' This is what I was looking for: grass stains, particles of grass, material which had been pushed into the weave of the cloth from a downward position. Both of these feet, both of these stockings were in the muddy area. It was quite wet, quite muddy. There was dirt on the stockings but not in a position of walking on that muddy soild [sic] or grass or other material.''

Sergeant Welch was recalled as a witness. He testified that the defendant was arrested at 12:25 a.m. on September 6 and was taken to the Long Beach police station. About 2 a.m. a conversation commenced between the defendant and the police officers. Shortly after 5 a.m. the conversation was recessed while the defendant made a telephone call. Thereafter the conversation was resumed. Prior to the recess the defendant

denied that he killed Mrs. Harley. The officers used neither force nor threat thereof against the defendant. Nor did they offer him any immunity or reward in exchange for any statement.

Sergeant Welch related what transpired subsequent to the telephone call as follows: "A. Defendant Webster upon returning to Room 351 in the Police Building, after making his phone call, said that he was ready to tell us the truth about what he knew about the happenings between himself and Diane Harley after leaving the Broadway Bar. He said that he had walked home with her after leaving the Broadway Bar, that they were out in front of the residence in the driveway, and they had some conversation in which she indicated that she wanted him to marry her. He said that all of a sudden she decided that she wanted to have sexual intercourse with him; that they were still in the driveway and that she had pulled up her dress and pulled down her underpants, and they both started to have sexual intercourse in the driveway while standing up. He said that they fell down in the driveway and that earlier when she had first talked to him, she had indicated that she wanted to go in the back yard and have the sexual intercourse where they would not be seen. He said after they fell down that she started to making noises and he was afraid that it would arouse the neighbors and they would come out to investigate. He said he put his hand up to her throat and choked her to keep her quiet. He then later said that he couldn't recall whether he had choked her or not. He said that he either helped her walk or carried her to the back yard and she lay down in the weeds. He said, first, that he couldn't recall any other act of sexual intercourse with her other than the one in the driveway, and then said that he did recall that he did have a second act of sexual intercourse with her while she was lying in the weeds in the back yard. He said that he believed that she was alive at this time because she groaned while she was lying there. He said that after completing the act of sexual intercourse that he got up and that she attempted to get up but could not get up. He believed that she was just passed out drunk. He said that he got up and walked back to his car which was parked near the Broadway Cafe and that he drove home. Upon arriving at home he couldn't recall whether Anne Chamberlain was up or not. He then later said that he believed that she got up. He said that he went into the house and he went to the service portion and he removed his jacket, the blue-checked shirt that he was wearing, and his shorts, and placed them in the laundry hamper.

He said that the trousers which he was wearing, he washed out and that this was the same pair of trousers which we had told him we had found in the water heater closet. He said that the slipper type shoes which he was wearing at the time were muddy, that he washed them off and that he polished them. That was about the substance of the conversation.''

The testimony as to a prior crime was given by Peter Klyne, a retired deputy sheriff of Orange County. He investigated a homicide on the early morning of July 1, 1946. Over the defendant's objection that it was irrelevant the witness testified that shortly before 8 a.m. on July 1, 1946, he went to a gum grove in Stanton and found the body of a woman. She was lying on her face. Her shoes were off. Portions of the witness' testimony were as follows: "When we arrived there . . . her body was lying, her feet were to the south and her head was to the north. She was nude from the hips down and had a dark coat on. I believe it was a dark black, I think, and it covered part of her head. . . . Her purse was found some 25 feet, which would be in the northwesterly direction from the body in the gum grove.'' Over the defendant's objection a photograph was admitted in evidence which showed the marks on the woman's neck.

The witness further testified that after his investigation he talked to Mr. Webster, the defendant, who said that he did not know the victim, Carrie Bendel, and had not killed her.

Ralph Bradford, a retired police officer of the Long Beach Police Department, testified as to his qualifications as an expert with respect to fingerprints. On July 1, 1946, he received a purse from Lieutenant Klyne of the Orange County Sheriff's Department (Lieutenant Klyne had previously testified that he found Carrie Bendel's purse about 25 feet from her body and that the purse was subsequently delivered to Ralph Bradford.) The black purse had been previously powdered for fingerprints. The witness photographed a latent fingerprint on the purse. He formed the opinion that the fingerprint was that of a person whose fingerprint was on an exemplar. He further expressed the opinion that the recent exemplar (which Dwayne Christen, an identification officer of the Long Beach Police Department, had testified was given by the defendant on September 6, 1963) and the latent fingerprint photograph showed prints which were made by the same finger.

Dr. Kade was recalled as a witness. Based upon his reading of the autopsy report and upon photographs of the body of

Carrie Bendel, he expressed the opinion that her death resulted from manual strangulation.

The first witness called on behalf of the defendant was a night auditor of a motel who testified as to a registration card which showed a registration on August 20, 1963, at 2:45 a.m. of a Mr. and Mrs. Webster. He could not identify the person who registered.

Corinne Anne Chamberlain testified that she was living with the defendant and that he came home about midnight on September 4, 1963. A portion of her testimony was that in the yard of their premises there were tomatoes growing between the garage and a little house in the back. There were tomatoes on the plants. The defendant did most of the yard work.

The defendant testified as a witness on his own behalf. He first met Mrs. Harley at a bar and later that night they went to a motel and he registered there, the registration being "Mr. and Mrs. Webster." A further portion of his testimony with respect to events occurring on the night of September 4, 1963, was as follows: "Q. . . . The next thing you remember after you knew you were drinking in the bar. What is the next thing after that? Do you recall where you were or what you were doing? A. I recall coming to somewhat in a shower, I remember about that, I mean coming to. I was taking a shower at my home . . . ." At the police station after his arrest he told the officers that he was "real drunk on this occasion" and that he "didn't recall very much of anything that had happened in the bar." He told the officers that he did not remember leaving the bar with Mrs. Harley. He further told them that he was not positive as to what happened, that he did not remember. He frequently told the officers that he had been drunk the night before. He did not tell Officer Welch that he choked Mrs. Harley while he was near her house. He did not recall making any of the statements which Officer Welch had related as a witness.

With respect to the statement of the defendant as to which Officer Welch testified, the record does not disclose that the defendant had been informed of his constitutional rights prior to or during the questioning as required under the *Escobedo-Dorado* rule (*Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]). "In the face of a silent record an appellate court cannot presume that the police informed a defendant of his rights to remain silent and to counsel. [Citations.] We are compelled to assume, there-

752

fore, that defendant was not apprised of these rights.'' (*People* v. *Brooks*, 64 Cal.2d 130, 136 [48 Cal.Rptr. 879, 410 P.2d 383].)

In view of the circumstantial nature of the other evidence against the defendant, the evidence of his statement in which he said that he had choked Mrs. Harley was bound to be very damaging to the defendant in the event that the jurors believed the testimony of Officer Welch. There is no reason to assume that the jurors found that testimony to be incredible. Adhering to the criterion enunciated in *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], we cannot say that we are satisfied beyond a reasonable doubt that the evidence of the defendant's statement did not contribute to the verdict reached by the jury and that the error was harmless. Consequently, the judgment cannot stand.

In the event of a retrial the trial court will again be required to determine the admissibility of evidence as to the homicide in Orange County in 1946. For that reason we undertake to resolve that question.

As stated in *People* v. *Kelley*, 66 Cal.2d 232, at pages 238-239 [57 Cal.Rptr. 363, 424 P.2d 947]: ''The general rule is that evidence of other crimes is inadmissible when it is offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged, because the probative value of such evidence is outweighed by its prejudicial effect. [Citations.] The purpose of the rule is to avoid placing the accused in a position of having to defend against crimes for which he has not been charged and to guard against the probability that evidence of other criminal acts having little bearing on the question whether defendant actually committed the crime charged would assume undue proportions and unnecessarily prejudice defendant in the minds of the jury, as well as promote judicial efficiency by restricting proof of extraneous crimes.'' But, as further stated in *Kelley* (page 239): ''It is settled that evidence of other crimes is ordinarily admissible where it tends to show guilty knowledge, motive, intent, or presence of a common design or plan.''[1]

Upon a retrial the provisions of section 1101 of the Evidence Code will be applicable. Therein it is provided: ''(a)

[1]In *People* v. *Ing*, 65 Cal.2d 603, at page 612 [55 Cal.Rptr. 902, 422 P.2d 590], it was stated in substance that a remoteness of 15 years in point of time affected the weight but not the admissibility of evidence of another offense offered to show a common scheme or plan.

Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion. (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts.''

We turn now to pertinent California decisions. In *People* v. *Webster*, 79 Cal.App.2d 321 [179 P.2d 633], the appeal by the defendant from his conviction of the murder of Carrie Bendel, a similar problem was presented. In that case evidence was introduced of an incident in which the defendant choked into unconsciousness a woman, Miss Sullivan. whom he had met earlier on the particular night at a tavern. Thereafter her clothing had been disarranged and torn. There were marks on her throat. In holding that the trial court had properly admitted the evidence of the other offense, the court stated (79 Cal.App.2d, at pages 326-327): ''The evidence before us concerning both offenses involved here is sufficient to satisfy the requirements of these rules. Defendant was sufficiently connected with and implicated in the offense for which he was on trial. It was thoroughly established that he spent the afternoon and evening of June 30th with deceased; that he had dinner with her is established by the testimony of the waitress who served them and the remnants of this meal found in her stomach by the autopsy surgeon. The tire track on the road corresponded with the tread of one of the tires on his automobile. Most convincing is his fingerprint found on the purse of the deceased. That defendant was concerned in the assault on Miss Sullivan was sufficiently established by her identification of him as her assailant. There was a similar plan or scheme or system appearing in both offenses. Defendant 'picked up' both women in cocktail bars and spent considerable time drinking with them. Both women had bruises and abrasions on their heads. Both women were cruelly choked, evidently with the right hand of their attacker,—one to death and the other into a state of collapse and unconsciousness. The garments of both were torn open, leaving the upper portion of the front of the torso exposed. It would be unusual to find two crimes with greater details of similarity of execution. showing a common plan or scheme or

system in the commission of both. Thus the evidence of the collateral crime was properly admitted."

In *People* v. *Burns,* 109 Cal.App.2d 524 [241 P.2d 308, 242 P.2d 9], the defendant was convicted of murder of the second degree. One of the contentions was that the trial court erred in admitting evidence of the commission of a crime which had occurred thirteen years earlier. The theory of the prosecution was that the deceased died from being beaten about the head by the defendant. The defendant contended that her death was due to injuries from falls. Over the defendant's objection evidence was received to the effect that in 1937 the defendant drove a woman he had recently met towards her home, then proceeded into a wooded area off the road, struck her with his fists, forced her out of the car, held her by the throat, and told her that she would either do what he wanted or suffer certain consequences. When she refused he kept hitting her in the face while he was holding her down on the ground by the throat. Finally he desisted.

In holding that the evidence was properly received, Justice Bray stated (109 Cal.App.2d, at pages 537-538) : "With these rules in mind, let us examine the similarity of the two offenses. In both, defendant 'picked up' the victim in a public place. He spent considerable time with the women before the assault. He drank with the women. Both women were taken to secluded places. Mrs. Qualtieri was severely beaten about the face by defendant's fists. There was evidence tending to show that Myrna was severely beaten about the face by a blunt object or by repeated blows by a human fist. There was a similarity in the injuries. Chief Kane testified that Mrs. Qualtieri's face was swollen; her lip was cut on the inside. Myrna's face was also swollen and her lips cut on the inside. Mrs. Qualtieri was choked or throttled. There was evidence tending to show that Myrna also was choked or throttled. In both cases defendant blamed his acts upon drinking, but denied the assault. In both cases defendant left the scene. Defendant claimed that the injuries to Myrna were accidental. The similarity of the circumstances under which the injuries were received as well as the similarity of the injuries themselves tend to negative accident. ▮▮ As said in *People* v. *Morani,* 196 Cal. 154, 160 [236 P. 135], quoting from *People* v. *Hickok,* 56 Cal.App. 13 [204 P. 555], which in turn quotes from *People* v. *Seaman,* 107 Mich. 348 [65 N.W. 203, 61 Am.St.Rep. 326] : ' " 'Upon principle and authority it is clear that where a felonious intent is an essential ingredient of the

crime charged, and the act done is *claimed to have been innocently or accidentally done,* or by mistake, or when the result is claimed to have followed an act lawfully done for a legitimate purpose, or where there is room for such an inference, it is proper to characterize the act by proof of other like acts producing the same result as tending to show guilty knowledge, and the intent or purpose with which the particular act was done and to rebut the presumption that might otherwise obtain.' " ' This similarity indicates a pattern which defendant has followed on these two occasions. ██ 'When a defendant's conduct in connection with the previous crime bears such similarity in significant respects to his conduct in connection with the crime charged as naturally to be explained as caused by a general plan, the similarity is not merely coincidental, but indicates that the conduct was directed by design.' (*People* v. *Peete, supra,* 28 Cal.2d 306, at p. 317 [169 P.2d 924].) Therefore the evidence was admissible, limited, of course, by proper instructions of the court, as was done in this case.

"Defendant has cited *People* v. *Glass,* 158 Cal. 650 [112 P. 281], for the proposition that the prior offense was not admissible here. That case and others which could be cited held under the facts of the particular case that evidence of prior offenses was not admissible. So far as our case is concerned, the statement in *People* v. *Kynette,* 15 Cal.2d 731 [104 P.2d 794], referring to the Glass case, applies to it and them: 'While factually distinguishable that case recognizes the exception to the general rule.' (P. 746.)

"Defendant contends that the prior offense, having occurred approximately 13 years prior to the one for which he was on trial was too remote. ██ Remoteness of the prior offense has been held to affect only the weight of the evidence, and not its relevancy or admissibility. [Citations.] In *People* v. *Miner,* 96 Cal.App.2d 43 [214 P.2d 557], in an abortion case, evidence of abortions committed 11 years prior to the ones charged was held 'not rendered inadmissible by the lapse of time. . . .' (P. 52.)

"Where a prior crime is otherwise admissible to show a pattern and similarity, its remoteness should not cause it not to be considered, for if a person has once acted in a particular manner with particular results, and then again acts in the same manner and with the same result, but claims that the second result was accidental, it cannot be said that the first incident is not of significance in determining the truth of the second incident."

In *People* v. *Griffin*, 66 Cal.2d 459 [58 Cal.Rptr. 107, 426 P.2d 507], a prosecution for murder, evidence of a subsequent attack on a woman in Mexico was received in evidence. The Supreme Court stated at pages 464, 465: "In the present case the evidence of the subsequent crime was admissible because the similarities between the crimes made evidence of the later crime relevant to prove that Essie Mae's injuries were not accidental but inflicted by defendant and to prove that he intended to rape her. The evidence tended to prove that in both instances defendant became acquainted with a man living with a common-law wife, used that acquaintance to be invited to the man's home for the night or longer, and then attacked the woman in the man's absence. Under these circumstances, the evidence of the other crime is relevant even though it occurred after instead of before the crime charged, and the chronology of the crimes does not therefore affect the admissibility of the evidence of the subsequent crime." At a later point in the opinion the Supreme Court stated (66 Cal.2d at page 466): "Proof of an intent to rape was crucial to the prosecution's felony murder theory, and proof of the Mexican crime was crucial in proving an intent to rape."

█ It is true that in the present case, unlike the situation in the earlier *Webster* case and in the *Burns* and *Griffin* cases, the evidence as to another offense did not show a design or scheme on the defendant's part to seek the friendship of women in bars or taverns and thereafter assault them by a method calculated to produce unconsciousness so that he could satisfy his sexual desires.[2] But in the event that the jurors first determined that the defendant was the person who caused the fatal injury to Mrs. Harley, the evidence as to the

---

[2]In 2 Wigmore on Evidence (3d ed. 1940) § 304, page 202, it is stated: "When the very doing of the act charged is still to be proved, one of the evidential facts receivable is the person's Design or Plan to do it (*ante*, § 102). This in turn may be evidenced by conduct of sundry sorts . . . . But where the conduct offered consists merely in the doing of other similar acts, it is obvious that *something more is required than* that mere similarity, which suffices for evidencing Intent (*ante*, § 302). The object here is not merely to negative an innocent intent at the time of the act charged, but to prove a pre-existing design, system, plan or scheme, directed forwards to the doing of that act. In the former case (of Intent) the attempt is merely to negative the innocent state of mind at the time of the act charged; in the present case the effort is to establish a definite prior design or system which included the doing of the act charged as a part of its consummation. In the former case, the result is to give a complexion to a conceded act, and ends with that; in the present case, the result is to show (by probability) a precedent design which in its turn is to evidence (by probability) the doing of the act designed."

earlier offense committed by him would lend support to the inference that his act was not the result of accident but was intended to be the cause of bodily injury to her so that he might accomplish an act of sexual intercourse without her consent. Such evidence was, accordingly, admissible to establish the intent with which the defendant acted.[3] (*People* v. *Griffin, supra,* 66 Cal.2d 459, 464, 466; see 2 Wigmore on Evidence (3d ed. 1940) § 363, pp. 275-276.)

The contention that the court should not have admitted evidence that the defendant told Mrs. Harley that he was a captain in the Narcotics Division of the Long Beach Police Department and was working on an important case presents no substantial question inasmuch as it does not appear that such evidence, even if improperly received, could have had any appreciable effect upon the determination of guilt. Such evidence did have a tendency to give rise to an inference that by such statement the defendant sought to cause Mrs. Harley to place trust in him. In any event, upon a retrial the trial court will be free to exercise its discretion as to whether that evidence should be excluded. (Evid. Code, § 352.)[4]

The judgment is reversed.

Cobey, J., and Moss, J., concurred.

[3] In section 302, pages 196-197, of 2 Wigmore on Evidence (3d ed. 1940) it is stated: ''To prove Intent, as a generic notion of criminal volition or wilfulness, including the various non-innocent mental states accompanying different criminal acts, there is employed an entirely different process of thought. The argument here is purely from the point of view of the doctrine of chances, —the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but the oftener similar circumstances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them. . . . In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, *i.e.*, criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offense according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent.''

[4] Section 352 is in part as follows: ''The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.''