Filed 11/21/24  P. v. Sahagun CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062640 |
| v. | (Super. Ct. No. 21NF0958) |
| ALVARO MENDOZA SAHAGUN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge. Affirmed and remanded with directions.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General,

Christopher P. Beesley and Caelle Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

*     *     *

A jury convicted appellant Alvaro Mendoza Sahagun of second degree murder (Pen. Code[1], § 187, subd. (a)). After the jury returned its verdict, Sahagun admitted to having suffered a prior "strike" conviction (§§ 667, subds. (d) & (e)(1), 1170.12, subds. (b) & (c)(1)). On appeal, Sahagun raises three issues: (1) He contends the trial court erred in instructing the jury as to the predicate offense for the lesser included offense of involuntary manslaughter; (2) He asserts the trial court abused its discretion in denying his *Romero*[2] motion to dismiss the prior strike; and (3) He argues the minutes of his sentencing hearing and the abstract of judgment must be corrected to conform to the oral pronouncement of the trial court regarding two fees. We conclude the trial court did not err in instructing the jury as to the predicate offense for involuntary manslaughter and find the trial court did not abuse its discretion in denying his *Romero* motion. As to the correction of his sentencing hearing minutes and abstract of judgment, the Attorney General agrees, as do we, these must be corrected to conform to the oral pronouncement of the trial court. In all other respects, we affirm the judgment.

---

[1] All undesignated statutory references are to this code.

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

# FACTUAL AND PROCEDURAL HISTORY

## I.

### PROCEDURAL BACKGROUND

In an information, the prosecutor alleged Sahagun unlawfully and with malice aforethought killed Marcos Zavala (§ 187, subd. (a)). Sahagun was also alleged to have suffered a prior serious or violent felony (§§ 667, subds. (d) & (e)(1), 1170.12, subds. (b) & (c)(1)). The trial court bifurcated the trial on the prior conviction and Sahagun waived jury as to the trial on the prior conviction. A jury trial proceeded on the murder count and after the jury returned its verdict, Sahagun admitted the prior conviction as true.

## II.

### EVIDENCE AT TRIAL

Sahagun lived at a Salvation Army shelter in a dorm that housed couples. He shared a room in the dorm with his partner, and other couples who lived in the dorm included Zavala and his partner L.B., and F.W. and T.W. The rooms were separated by thin partitions, which made it easy to hear what occurred nearby, and curtains hung in each entrance to the rooms.

Zavala and L.B., who had previously been removed from the Salvation Army shelter, frequently caused disturbances to others in the dorm with arguments and fighting between themselves. For example, F.W. testified Zavala and L.B. fought day and night and it was "mean, cruel, vicious, physical violence towards one another, 24 hours a day, every day[,]" and Zavala and L.B. would keep F.W. awake with their screaming and fighting.

The night Zavala was stabbed, Zavala and L.B. engaged in a loud altercation. F.W. testified she heard Zavala and L.B. screaming and sounds of

3

a physical altercation. After she was woken up by the altercation, F.W. stated she walked outside to use the restroom and smoke a cigarette, and Sahagun's partner walked with her to the restroom. As F.W. walked back to her dorm, she testified she saw Sahagun look inside of Zavala and L.B.'s room as Sahagun stood outside of it, and then she heard L.B. screaming Sahagun had stabbed Zavala. F.W. stated Sahagun appeared to be holding something in his hand but she did not know what it was,[3] he appeared to be sweating profusely, and she felt threatened when he looked at her.

T.W. similarly testified he was woken up by Zavala and L.B. fighting the night Zavala was stabbed. T.W. said when he was woken up he "told [Zavala] to shut the fuck up." T.W. also heard Sahagun politely telling Zavala to stop as Sahagun's wife had to get up and go to work in the morning. T.W. testified he and his wife, F.W., were "fed up because of the fighting" so they went outside to have a cigarette, and he also went to the restroom. After exiting the restroom, T.W. stated he heard a female scream, ran to the area, and saw Zavala come out and scream, "'She stabbed me. She stabbed me.'" After T.W. went to get someone from the facility, he testified he walked past Sahagun who said something like, "'I can't take this anymore.'"[4]

The jury was shown video from a police officer's body-worn camera in which L.B. stated Zavala had said Sahagun stabbed him.

---

[3] In an interview with police, F.W. said it appeared Sahagun had a knife but she could not see the blade. She also said she was not certain it was a knife.

[4] T.W. had previously provided different variations of what Sahagun had said, and on cross-examination at trial, T.W. said he probably could not testify to the exact words.

A forensic pathologist testified Zavala had a stab wound to his inner left chest that went into his heart (there were two perforations to his heart), and a stab wound (with an entry and exit wound) to the back of his left upper arm. The forensic pathologist further testified Zavala had methamphetamine in his system, but that was not what caused his death.[5]

Sahagun testified at trial. On the night Zavala was stabbed, Sahagun said he had just fallen asleep when he was awakened by Zavala and L.B. fighting, and people yelling at them to be quiet. Sahagun stated he yelled at Zavala that he had no respect for anyone,[6] and Zavala replied to him in Spanish, "'Why don't we just go outside then?'" After hearing Zavala's response, Sahagun thought "'Oh, shit.'" Sahagun said he took Zavala's statement to be a challenge, but he did not accept it. Sahagun testified Zavala was bigger, much younger, and more agile than him, and Sahagun had vision and mobility issues.

Sahagun said he quickly put on his shoes because he did not want Zavala coming into his room where his partner was. He also grabbed a knife because he was scared. He knew Zavala was aggressive and heard Zavala had previously attacked someone for trying to stop Zavala from assaulting L.B. Sahagun testified he also heard Zavala assaulting L.B. "[o]n a daily basis." Sahagun said he kept the knife hidden because he planned to try

---

[5] A forensic scientist testified the level of methamphetamine in Zavala's blood was in a range considered to be toxic or fatal, and L.B.'s blood also tested positive for methamphetamine.

[6] Sahagun said he unsuccessfully tried to reason with Zavala on prior occasions because Sahagun's partner needed to sleep before she had to go to work.

to reason with Zavala. Sahagun stated he had the knife only to defend himself and was not intending to use it to stab Zavala.

Sahagun testified he was almost to the door of the building when he heard Zavala running at him from behind.[7] Sahagun stated he turned around and saw Zavala coming at him with rage on his face and one of his hands raised. Sahagun said there was no time for him to say anything. He reacted out of instinct, turned around, stuck his hand out and pointed the knife at Zavala, and ducked. Sahagun said he was concerned he was going to be knocked down, and it was not his intention to reach out and stab Zavala or to kill Zavala. Sahagun testified Zavala's momentum carried him to Sahagun until they were both facing each other and the knife was in Zavala. Sahagun said there were no "blows" or a struggle, and he does not know how Zavala had a separate stab wound on his arm.

After they separated, Sahagun testified he went to the restroom and washed his face, hands, and the blade of the knife. Sahagun stated he panicked and threw the knife. He did not specifically remember looking into Zavala's room but he did remember looking for him to see if he was okay. Sahagun testified he did say to T.W. something like, "'I couldn't take it'" or "'I can't take it,'" and what he meant was that something needed to be done so he had yelled at Zavala for the first time.

Sahagun agreed to go to the police station for questioning. Sahagun admitted he initially lied to police at the station and acted as if he did not know what had happened. Sahagun said when he first went to the

---

[7] In his police interview, Sahagun indicated he saw Zavala move the curtain to exit Zavala's room, but Sahagun testified at trial that was not accurate.

police station he was unaware Zavala had died, but after learning about Zavala's death, he had a change of heart and "came clean." Sahagun testified he told the police he flushed the knife in the toilet, but that was not true. He later told the police he "threw the knife."

Sahagun also demonstrated and described his interaction that night with Zavala to the police.[8] Sahagun told the police a distance of about six to eight feet separated him from Zavala. When asked by the police if they met in the middle, Sahagun agreed. But when asked at trial if they met in the middle, Sahagun testified he did not "know if it was exactly the middle[.]"[9]

Sahagun also testified he had used heroin, methamphetamine, and methadone within the past 24 hours of the night Zavala was stabbed.[10] Sahagun stated his drug use prior to the stabbing had nothing to do with his decision-making.

The defense also called as witnesses Sahagun's friend and Sahagun's sister, who testified Sahagun was known to be a peaceful person.

III.

JURY INSTRUCTIONS

When discussing jury instructions with the attorneys, the trial court believed it was appropriate, based on the evidence presented at trial,

---

[8] The audio and video recording of this demonstration was played for the jury.

[9] In a recorded jail telephone call with his partner, Sahagun stated, inter alia, he "got tired of that shit" and had "just defended [him]self." This call was also played for the jury.

[10] Sahagun's urine sample tested positive for methamphetamine, morphine, codeine, and methadone, as well as other substances.

7

"to instruct on [the lesser included offenses of] voluntary manslaughter on both an imperfect self-defense and sudden heat of passion and quarrel theory, as well as an involuntary manslaughter in light of the fact that [Sahagun's] testimony could be interpreted as demonstrating a lack of malice." The trial court further noted it had some questions as to the theory of involuntary manslaughter and "whether it should be a criminal act or also a lawful act with criminal negligence." The court stated the predicate act for involuntary manslaughter "in this case, clearly, the only crime. . . the [c]ourt believes is proven up by the evidence would be brandishing a weapon. I think we would—as to a criminal aspect if it's appropriate to give involuntary manslaughter[,]" which Sahagun's counsel agreed with.

The prosecutor indicated his understanding that "the crime" under involuntary manslaughter "has to basically be the act that causes the death. And brandishing, by definition, really can't. So isn't it either an assault-type crime or a battery?" After further discussion, the trial court stated "[i]t does appear to me that the evidence supports the brandishing as the crime. And that's still your position, correct, [Sahagun's counsel]?" Sahagun's counsel responded it was.[11]

The trial court ultimately provided instructions for, inter alia, self-defense or defense of another (CALCRIM No. 505), second degree murder

---

[11] There was also discussion of whether the brandishing instruction "*Alternative 2A*" (the knife was exhibited in a rude, angry, or threatening manner) or "*Alternative 2B*" (the knife was unlawfully used in a fight or quarrel) should be given. (CALCRIM No. 983.) The trial court reasoned "*Alternative 2A*" was appropriate because it was broader, and Sahagun's counsel agreed.

with malice aforethought (CALCRIM No. 520),[12] voluntary manslaughter in the heat of passion (CALCRIM No. 570), voluntary manslaughter in imperfect self-defense or imperfect defense of another (CALCRIM No. 571), and involuntary manslaughter with the predicate offense of brandishing a deadly weapon (CALCRIM Nos. 580 & 983).

IV.

JURY DELIBERATIONS AND VERDICT

While deliberating, the jury asked, "During the defendant's testimony on stand did he mention how he 'poked' or 'stuck' the victim? Can we see references like this?" The trial court responded by asking the jury whether it would prefer the trial court review the transcript to attempt to identify the questions and answers responsive to the jury's question, which will take some time, or the trial court can have the reporter read back the entirety of Sahagun's testimony, which will take approximately 45 minutes. The jury decided it did not want any testimony read back. The jury also asked for "[f]urther clarification of implied malice, specifically the definition of 'intentionally committing the act.'" The trial court responded by referring the jury to the instruction defining implied malice (CALCRIM No. 520) and also noting, inter alia, "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

The jury found Sahagun guilty of murder in the second degree (§ 187, subd. (a)).

---

[12] During closing arguments, the prosecution conceded it was not arguing there was express malice.

## V.

### The *Romero* Motion and Sentencing

Following the jury's verdict, Sahagun admitted the prior strike conviction. At sentencing, Sahagun filed a *Romero* motion, which asked the trial court to dismiss this prior conviction. Sahagun argued his prior strike, a residential burglary conviction (§§ 459, 460, subd. (a)), occurred approximately 37 years ago and involved his own family's home. While the prosecution did not file a written opposition, the prosecutor noted at the hearing that, between 1982 and 2011, Sahagun had 19 misdemeanor and 8 felony convictions. The trial court declined to exercise its discretion to strike the strike.

The trial court sentenced Sahagun to 30 years to life imprisonment (which was double the 15 years to life imprisonment because of the prior strike).

### DISCUSSION

### I.

#### LESSER INCLUDED OFFENSE

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense. [Citation.] 'The rule's purpose is . . . to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence.'" (*People v. Shockley* (2013) 58 Cal.4th 400, 403.) "This instructional requirement "'prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on

10

the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.'"'" (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29–30 (*Brothers*).) "'[E]*very* lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury.'" (*People v. Thomas* (2012) 53 Cal.4th 771, 813 (*Thomas*).) That said, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) "We conduct independent review of issues pertaining to instructions." (*People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1411; see also *Brothers, supra,* at p. 30.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "[M]alice may be express or implied." (§ 188.) Implied malice has been interpreted to have "'"both a physical and mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.'"'" (*People v. Bryant* (2013) 56 Cal.4th 959, 965.)

"Voluntary and involuntary manslaughter are lesser included offenses of murder." (*Thomas, supra,* 53 Cal.4th at p. 813.) Involuntary manslaughter is the "unlawful killing of a human being without malice. [Citation.] It is statutorily defined as a killing occurring during the commission of 'an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection.'" (*Brothers, supra,* 236 Cal.App.4th at p. 31; see also § 192, subd. (b).) Moreover,

11

involuntary manslaughter also may include a killing during an inherently dangerous assaultive felony. (*Brothers, supra,* at p. 34 ["an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony"].)

Here, the trial court instructed on the lesser included offense of involuntary manslaughter based on the predicate misdemeanor offense of brandishing a deadly weapon under section 417, subdivision (a).[13] Sahagun, however, argues the trial court erred because brandishing does not fit Sahagun's conduct and, instead, the trial court should have provided the predicate offense of assault with a deadly weapon under section 245, subdivision (a)(1).[14]

As an initial matter, the trial court did not err in providing the instruction for involuntary manslaughter with the predicate offense of brandishing a deadly weapon. At trial, Sahagun's counsel agreed with the brandishing instruction and Sahagun does not now contend the instruction incorrectly stated the law. Instead, Sahagun asserts the instruction was

[13] Section 417, subdivision (a)(1), provides in part, "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor . . . . "

[14] Section 245, subdivision (a)(1), reads in part, "Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm . . . . " An assault is defined in section 240 as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

12

misleading and confusing because "a brandishing instruction was not responsive to the conduct [Sahagun] displayed when he stabbed Zavala." This argument is unavailing. At trial, Sahagun testified, when he heard Zavala running at him, he reacted out of instinct, turned around, stuck his hand out and pointed the knife at Zavala, and ducked, and Zavala's momentum carried him to Sahagun until the knife was in Zavala. Sahagun also testified he did not intend to stab Zavala. This evidence was sufficient to support a brandishing instruction as the predicate offense for involuntary manslaughter. (See *Thomas, supra,* 53 Cal.4th at p. 814 ["an accidental shooting that occurs while the defendant is brandishing a firearm in violation of section 417 could be involuntary manslaughter"].)

Sahagun also argues the evidence was consistent with an assault with a deadly weapon. He points to the multiple stab wounds and his prior demonstration to the police, asserting the jury could have inferred he charged at Zavala. But whether certain evidence may have supported an instruction

13

for assault with a deadly weapon does not negate the fact that substantial evidence supported the brandishing instruction as the predicate offense.[15]

Additionally, even if an instruction for assault with a deadly weapon as a predicate offense for involuntary manslaughter should have also been given, any error was harmless. "In noncapital cases, 'the rule requiring sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law.' [Citation.] As such, 'in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836].'" (*People v. Beltran* (2013) 56 Cal.4th 935,

---

[15] Sahagun argues the supposedly misleading brandishing instruction violated the California and United States Constitutions and created a fundamentally unfair trial. This argument fails because the brandishing instruction was supported by sufficient evidence and, as Sahagun concedes, was a correct statement of the law. We also disagree with Sahagun's argument the brandishing instruction somehow lessened the prosecution's burden to prove beyond a reasonable doubt second degree murder. Sahagun cites *Mullaney v. Wilbur* (1975) 421 U.S. 684 (*Mullaney*) and *People v. Banks* (1976) 67 Cal.App.3d 379 (*Banks*), but those cases are inapposite. *Mullaney* involved a state law that placed the burden on the defendant to prove that the defendant "acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter" (*Mullaney, supra,* at p. 703), and *Banks* involved instructions that shifted the burden to the defendant to prove a homicide had been committed in self-defense (*Banks, supra,* at pp. 383–384). Here, Sahagun has not asserted there were any instructional errors as to second degree murder or voluntary manslaughter, and the burden to prove Sahagun acted with implied malice for second degree murder remained with the prosecution.

955 (*Beltran*).)[16] "[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error." (*Id.* at p. 955.)

Here, it is not reasonably probable a more favorable result would have been obtained had the trial court also instructed on assault with a deadly weapon as a predicate for involuntary manslaughter. The jury did not face an all-or-nothing choice between convicting Sahagun of second degree murder or a complete acquittal. Instead, the jury also had the option of convicting Sahagun of voluntary manslaughter or involuntary manslaughter with the predicate offense of brandishing. The jury was instructed on the different mental states for murder and involuntary manslaughter. Additionally, the jury was told if the prosecution did not meet its burden of proving beyond a reasonable doubt Sahagun acted with intent to kill or conscious disregard for human life, it could not find Sahagun guilty of murder. (CALCRIM No. 580.) If the jury had determined the prosecution failed to prove Sahagun acted with implied malice, it had the option to convict him of involuntary manslaughter with the predicate offense of brandishing. Indeed, Sahagun's counsel argued that point in his closing argument, asserting "if you feel that Mr. Sahagun did something wrong, but he did not have the actual malice, this is what you could find as an involuntary manslaughter."

But because the jury chose to convict Sahagun of second degree murder, it necessarily found beyond a reasonable doubt there was implied

---

[16] To the extent Sahagun is arguing the standard for a federal constitutional error under *Chapman v. California* (1967) 386 U.S. 18 applies here, that argument is misplaced. (See *Beltran, supra,* 56 Cal.4th at p. 955.)

malice, which is adverse to Sahagun's involuntary manslaughter argument. (See *People v. Lewis* (2001) 25 Cal.4th 610, 646 [failing to instruct on a lesser included offense is harmless error "when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions"].) We are not persuaded the jury would have found Sahagun lacked implied malice but for the jury being given an involuntary manslaughter instruction with brandishing as the predicate offense. Under the circumstances here, there is no reasonable probability a more favorable result would have been obtained had an instruction for involuntary manslaughter with the predicate offense of assault with a deadly weapon been provided. (See *People v. Rogers* (2006) 39 Cal.4th 826, 884 [failing to instruct on involuntary manslaughter is harmless error where jury was instructed on lesser included offenses of implied malice second degree murder and heat-of-passion voluntary manslaughter but convicted defendant on first degree premeditated murder].)

Sahagun argues the prosecution's closing argument, the jury's 11 hours of deliberations, and the jury's questions all suggest the error was not harmless. But these points do not demonstrate a reasonable probability that a more favorable result would have occurred under the circumstances here.[17] Sahagun notes the prosecution, in its closing argument, highlighted Sahagun's testimony that he did not know how Zavala had the wound on his arm, and according to Sahagun, an assault with a deadly weapon instruction

---

[17] Sahagun also asserts, if no other witness sees the homicide or any details associated with its commission, then *any* instructional error automatically results in prejudice. The two cases cited by Sahagun—*People v. Hatchett* (1944) 63 Cal.App.2d 144 and *People v. Newcomer* (1897) 118 Cal. 263—do not hold that such a broad rule applies.

would have accounted for the discrepancy. However, the prosecution's closing argument appears to have raised Sahagun's failure to explain the wound to the arm in an attempt to discredit Sahagun's entire narrative, thereby undermining Sahagun's argument that his actions were in self-defense and without implied malice.[18] Similarly, while some courts have considered the length of jury deliberations and jury questions as part of the harmless error inquiry, those circumstances do not automatically compel a conclusion there was prejudice. (See *People v. Avena* (1996) 13 Cal.4th 394, 436 [rejecting "assumption the length of penalty deliberations in this case indicates the jury had 'difficulty' with the penalty decision"]; *People v. Brown* (1985) 40 Cal.3d 512, 535 ["jury may simply have sifted the evidence with special care in light of the capital implications of a guilt verdict"], revd. on other grounds *sub nom. California v. Brown* (1987) 479 U.S. 538.)[19]

---

[18] The prosecutor argued Sahagun "described in remarkable detail putting on his shoes, the sausage and cheese cutting knife that he grabbed from the night before, walking out, hearing the . . . footsteps of [ ] Zavala coming at him, turning around, sticking the knife into [ ] Zavala, face-to-face, looking down, seeing the blood, [Zavala] backs up and [Zavala] runs. Every single detail. [Sahagun] never said, 'it all happened so fast. I have no idea.' He gave you second-by-second laying out his claim of self-defense, but it fails. Not because I say so. Because the forensics give [ ] Zavala a voice from the grave. How did he get stabbed again? [¶] No explanation means the explanation you got was unreasonable based on the facts. It doesn't make sense. You don't get to come in and say, 'I've got every detail except this giant one, and, oops, I forgot about that,' without a consequence. And the consequence is your story has become unreasonable. That's for you to decide."

[19] Given our conclusion the trial court did not error in providing the brandishing instruction as the predicate offense and any error in not providing an assault with a deadly weapon instruction was harmless, we need not address the Attorney General's argument that any error was invited.

## II.

## THE *ROMERO* MOTION

"When a defendant is convicted of a felony, and it is pleaded and proved he had committed prior 'violent' or 'serious' felonies, the Three Strikes law provides for the imposition of increased sentences. [Citations.] A trial court is presumed to have acted properly whenever it sentences a defendant in accordance with the Three Strikes law. [Citation.] A sentencing court nonetheless has the power to dismiss one or more prior strike convictions in the interests of justice." (*People v. Nunez* (2023) 97 Cal.App.5th 362, 370 (*Nunez*).) "In deciding whether to exercise its discretion to dismiss a prior strike conviction in the interests of justice, a trial court 'must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [sentencing] scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.'" (*Id.* at pp. 370–371; see also *People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).)

A trial court's decision not to strike a prior felony conviction is reviewed for abuse of discretion, and "'"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary."'" (*People v. Carmony* (2004) 33 Cal.4th 367, 376.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.) In light of the "presumption that any sentence conforming to the Three Strike law's sentencing norm is both rational and proper[,]" "'a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited

18

circumstances,' such as 'where the trial court was not "aware of its discretion" to dismiss [a prior strike] (citation), or where the court considered impermissible factors in declining to dismiss [a prior strike],' or 'where no reasonable [person] could disagree [the defendant] falls outside the spirit of the three strikes [law] scheme . . . .'" (*Nunez, supra,* 97 Cal.App.5th at p. 371.)

Here, Sahagun argues the trial court abused its discretion by not dismissing his prior strike, which was a 1986 residential burglary conviction. However, applying this deferential standard of review, the record reflects the trial court properly exercised its discretion. In considering the circumstances and nature of the prior strike, the trial court noted Sahagun was only 22 years old at the time of the prior conviction. It also noted the victim of the burglary, Sahagun's father, had abused Sahagun for a long time at an early stage of Sahagun's life and it appeared Sahagun fled the house because of the abuse. Nevertheless, the trial court stated "the continuous and repeated history, even though the vast majority are not violent, the fact that it ultimately ended up in [Sahagun] committing the crime of murder, and the fact that it does appear to the [trial c]ourt that [Sahagun's] criminal history as a whole, that [Sahagun is] the type of person that was intended to fall within the meaning of the strike statute." Ultimately, the trial court declined to dismiss the prior strike.

Sahagun argues his present crime "was unusual given the significant mitigation surrounding it." He asserts Zavala "'was the aggressor or provoker of the incident,'" the homicide stemmed from past continuous provocation by Zavala, and there were no heinous or brutal attributes of the homicide that would shock the public. He also contends certain aspects of his background, character, and prospects, the length of his current sentence relative to his age, and the prior strike offense support dismissing the prior

19

strike. But Sahagun's arguments do not establish an abuse of the trial court's discretion, and there is no indication the trial court believed it could not consider relevant factors or that it considered improper factors.[20] Sahagun highlights he was only 22 years old at the time of the strike conviction, which was more than thirty years ago, but this does not mandate a finding that the trial court abused its discretion. (See *Nunez, supra,* 97 Cal.App.5th at p. 372 ["fact that [defendant's] strike conviction occurred in 1990 when he was only 18 years old does not compel a different result"].) Sahagun also asserts "his criminal behavior predominantly took the form of drug offenses and property crimes[,]"[21] but "'*Williams* and its progeny do not hold that a defendant's criminal career must consist entirely or principally of violent or serious felonies to bring a defendant within the spirit of the Three Strikes law.'" (*Id.* at p. 372.)

*People v. Avila* (2020) 57 Cal.App.5th 1134 (*Avila*) does not compel a different result. There, the defendant demanded money from two different individuals selling oranges and in one instance squashed two bags of oranges and in another instance threw a bag of oranges to the ground and stomped on them. (*Id.* at p. 1139.) The defendant was convicted of attempted second degree robbery and attempted extortion, and he was sentenced to 25 years to life plus 14 years after the trial court denied his *Romero* motion, which sought to strike his three prior strikes. (*Id.* at pp. 1139–1140.) The

[20] Sahagun asserts the trial court speculated his drug use prompted him to kill Zavala. We do not read the trial court's comments cited by Sahagun as an indication it believed Sahagun's drug use prompted the killing.

[21] As Sahagun notes, the probation report indicated he had 19 misdemeanor convictions and 8 felony convictions between 1982 and 2011.

appellate court concluded the trial court had abused its discretion in denying the *Romero* motion. (*Id.* at pp. 1140–1145.) While *Avila* recognized the defendant's age and the length of time since the prior offenses could be factors in mitigation, *Avila* did not hold that those circumstances always require finding an abuse of discretion. (See *id.* at pp. 1141–1142 [noting "remoteness remains a factor in mitigation" and it was "significant that [defendant] committed his prior strikes when he was under the age of 21"].) Notably, *Avila* recognized the defendant's present offense "was not violent or brutal by any stretch" and he "did not use a weapon or otherwise use physical violence against the victims, nor did he make any specific threats." (*Id.* at p. 1142.) The circumstances here are plainly different, where Sahagun's present offense was second degree murder.

### III.

### ABSTRACT OF JUDGMENT AND MINUTE ORDER

At the May 12, 2023, sentencing hearing, the trial court found Sahagun did not have the ability to pay a $40 court operations fee (§ 1465.8) and a $30 conviction assessment fee (Gov. Code, § 70373), and it permanently stayed those fees. However, the minutes from the May 12, 2023, sentencing hearing and the abstract of judgment show the trial court ordered the payment of those two fees, and thus, Sahagun argues the abstract of judgment and the sentencing hearing minutes from May 12, 2023 should be corrected to reflect the trial court's oral pronouncement. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385 [recognizing the oral pronouncement controls "[w]here there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment"].) The Attorney General agrees as do we. The May 12, 2023 sentencing hearing minutes and

21

the abstract of judgment should be corrected to reflect the court operations and conviction assessment fees were permanently stayed.

## DISPOSITION

The trial court is directed to prepare and file amended minutes of the May 12, 2023, sentencing hearing and an amended abstract of judgment that identifies the $40 court operations fee and the $30 conviction assessment fee are permanently stayed. The trial court is also directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

MOTOIKE, ACTING P. J.

WE CONCUR:

DELANEY, J.

GOODING, J.

22